Alexander Del Gtok.no, J.
Claimants, pursuant to a joint venture agreement, entered into a contract with the State of New York for the construction of Interstate Route Connection 512-Gowanus Expressway, 20th Street to 36th Street along 3rd Avenue, F. A. Project No. 1-278-1(47 0.82 mile of Interstate Highway (plus 0.82 mile street repairs on 3rd Avenue), Borough of Brooklyn, City of New York, Kings County, known as Contract FIGE 60-2, being the letting of March 17, 1960 and which *300 contract is dated April 8, 1960. Said contract was duly performed and the same accepted by the State of New York as completed on December 28, 1964.
The six remaining causes of action (the fifth cause of action having been withdrawn at trial) charge the State with various and sundry contract misinterpretations, interferences and delays which seem to be inherent, although needlessly so, in State construction contract work. As a result claimants now seek recompense for the added and excessive costs incurred. This memorandum, together with the several requests to find marked ‘1 Found ’ ’ submitted by the claimants and the State and initialled, constitutes the opinion of the court.
FIRST CAUSE OF ACTION.
The contract by its terms is controlling and provides in relevant portion as follows:
FOUNDATION REPORT (p. 64) .
It will be the Contractor’s obligation and responsibility to use methods and equipment which will insure the satisfactory completion of the required work with a minimum of delay, (p. 65). (Emphasis added.)
ITEM 85 TAS — TUBULAR CAST-IN-PLAOE CONCRETE PILES —16" DIA. X %" (P. 139)
The specifications for Item 85 T shall apply with the following additions and modifications: * * *
INSTALLATION OF PIPE PILE
The methods and equipment to be used in installing pipe at the location and to the depth shown on the Contract Plans, or in a satisfactory subsoil as approved by the Deputy Chief Engineer (Bridges), is the responsibility of the Contractor. (Emphasis added.)
(p. 140) The Contractor’s attention is directed to the close proximity of existing foundation and piles at the proposed pile locations. Special care shall be exercised not to distwb existing foundations while driving piles. Except as hereinafter specified, the number of hammer blows shall be kept between eight and ten blows per inch. When this limit of ten blows is reached, the Contractor shall use either or both of the following methods to reduce resistance:
(1) Water jetting. . . .
(2) Boil mucking. . . .
(3) [Chopping or drilling.] (Emphasis added.)
FINAL SEATING OF PILES
After water jetting, soil mucking or chopping, pile driving shall be resumed. Alternate driving and cleaning operations are anticipated for the installation of steel pipe pile. At final seating, the piles shall be driven to the tip elevation shown on the Contract Plans or to a deeper elevation to obtain a driving resistance of not less than (10) blows per inch of the specified hammer for the final inch driven, (pp. 140-41). (Emphasis added.) * * *
*301 MEASUREMENT AND PAYMENT
* * -t
The unit price bid per linear foot shall include the cost of furnishing all labor, materials and equipment necessary to establish a proper procedure of driving the pipes. The unit price bid shall also include * 11 * the cleaning and de-watering of the pipes * * * (p. 142). (Emphasis added.)
In addition, the Public Works Specifications of January 2, 1957, previously alluded to under Item 85 TAS, provide, in part, as follows:
ITEM 85T-TUBULAR OAST-IN-PLACE CONCRETE PILES
a. Work. Under this item the Contractor shall furnish and construct open ended tubular piles filled with concrete at locations indicated on the plans or as directed by the Engineer. The piles shall be constructed by filling with concrete steel tubes which are left in the ground, (p. 386). (Emphasis added.)
* * *
e. Placement of the Tube. The methods and equipment to be used in establishing the tube on rock or in satisfactory material is the responsibility of the Contractor, (p. 387). (Emphasis added.)
* * e
The Contractor may, if he so elects, after a study of the underlying material, use any or any combination of the following procedures:
(1) Previously drill the material at the location of the pile to a diameter not greater than 2" less than the outside diameter of the tube itself.
(2) Drive and not clean the tube until it is near its anticipated final position. In this instance, the sole responsibility for deformation of the pile shall rest with the Contractor. If any distortion of the pile occurs it shall be removed and a new pile or tube driven in its place.
(3) Drive the tube and remove obstructions which are found as the tube is driven below the surface to its final location. In all instances the tube in its final location shall be cleaned from its tip to its top. (p. 387). (Emphasis added.) * *
f. Measurement and Payment. * * 1i The unit price bid per linear foot shall include the cost of furnishing all labor, materials and equipment necessary to complete the work, including the furnishing and using of well driving equipment, or any other type of equipment necessary to establish a proper procedure under the Contractor’s selection of his method of driving the piles. The unit price bid shall also include the cutting off of surplus lengths of tubes, the removing of the material from the tube and the placing of concrete in the tube. (p. 388). (Emphasis added.)
Despite the clarity of these provisions, which merely reinforce the commonly accepted view that a contractor may choose his own method of performance, absent a clear direction to the contrary in the contract or the specifications, difficulty was immediately encountered regarding the manner in which the piles were to be driven.
It is clear and uncontradicted that claimants intended to use a removable end closure until the specified resistance of 10 blows per inch was reached at which time the temporary end *302 closure would be removed by shattering it with a steel ram. This is amply supported by the estimate sheet for Item 85 TAS prepared by Mr. Winterberg, chief engineer for the Fehlhaber Corporation, which provides for end closures (“End closures (Cl) 661 at 6.00 ea.”), for the removal of debris from the last few feet of the pile (“ Clean out last 5'0" — -3300 c.y. at 20.00") and for the disposal of this pile soil (“ Dispose of pile soil — from last 5' 0 feet 3305 c.y. = 150 c.y. at 15.00/c.y."). In addition, claimants had written to their supplier enclosing four prints of a sketch for a removal oast iron end closure and requested a shop drawing of the proposed pattern, which was in fact received.
Subsequently, a preconstruction meeting was held at which some concern was expressed regarding the cleaning of the piles. At that time Mr. Winterberg announced claimants ’ intention to use a removable end closure. Despite the fact that this meeting was attended by representatives of the consulting engineers, Madigan-Hyland, and by representatives of the actual design engineers, Praeger and Cavanaugh, no objection to implementation of the proposed method was raised other than a suggestion by Mr. Praeger that a formal submission of this method be made and approval requested thereof.
This suggestion was complied with and claimants, by letters and accompanying drawings, sought approval of their proposed method from Madigan-Hyland. The latter, through Mr. Isaak, eventually responded, stating that the matter would have to be discussed with the responsible State officials but that in the meantime claimants should begin driving open end piles immediately.
Upon receipt of this letter, claimants again wrote to Madigan-Hyland requesting review of the matter by the responsible State officials and advising that they would proceed with the work but only under protest. Mr. Isaak, who, although present in court part of the time, was never called as a witness, again replied to the letter and reiterated his demand that the piles be driven immediately.
Subsequently, Madigan-Hyland forwarded to claimants a letter from the State District Engineer, Mr. Saar, also never called as a witness, which contained the following passage-s: ‘ ‘ The Specification for this item on Page 140 of the Proposal definitely indicates the procedure to be used in driving piles. Further, it is apparent that open ended piles are to be used ¡so that existing piles will not be displaced. This condition existed when the contract plans were prepared, and it was the procedure used by the contractor in submitting his bid. There is no reason why *303 the procedure should be changed at this time, since the conditions are identical to the conditions which existed when the contract was let.
“ Therefore, it is the decision of this Department that our disapproval of the contractor’s proposed method of installing piles under Item 85TAS shall remain in effect, and that the contractor’s request for a hearing to discuss this matter be hereby denied. Please instruct the contractor accordingly.”
Thereafter, claimants wrote a final letter to Madigan-Hyland, receipt of which was acknowledged, in which claimants reasserted their rights under the contract, denied that any deviations from the specifications were encompassed by their planned method and, additionally, asserted that there was “no added hazard to the adjacent piling because the temporary end closure is to be removed as soon as the specified resistance is met and the procedures specified on page 140 of the Specifications would then be followed.”
Thus, two issues must be considered by the court: first, whether the terms of the contract permitted the claimants a choice in their manner of performance; and second, whether the method chosen would have resulted in a satisfactory performance of the contract.
To this court it is clear beyond the slightest doubt that the choice of a method of performance lay exclusively with the contractor. In no less than six instances, three contained in the contract and three in the specifications, is it expressly stated in various language of identical import (as hereinbefore set forth) that the choice of and responsibility for the methods utilized lies exclusively with the contractors. At the moment the court can only guess as to the position that would be taken by the State if the method of pile driving it had here decreed would have proven unsuccessful.
Nevertheless, the court feels obliged to comment on some of the inferences the State has drawn from the terms of the contract and the specifications. Initially to be considered is its interpretation of the specification provision that “the Contractor shall furnish and construct open ended tubular piles ” (emphasis added) (p. 386). The State’s brief states that “ a contract that would permit an end closure would specify it. ’ ’ To the court this is similar to saying that “ our failure to expressly exclude temporary end closures is not to mean that we did not intend to do so. ’ ’ Unfortunately, it is hornbook law that an ambiguous or incomplete contract is to be construed against the author of the instrument.
*304 ‘ ‘ Failure to recite clearly the intention of the parties to a contract for the construction of public works may create liability against the State of New York if the true meaning of such a contract is so obscurely expressed that a bidder is likely to be misled and is misled thereby. (Aldrich v. New York Life Ins. Co., 235 N. Y. 214, [1923]. ” (Rusciano & Son Corp. v. State of New York, 201 Misc. 690, 696, affd. 281 App. Div. 733).
Furthermore, claimants did in fact furnish open-ended piles and it is beyond quibble that that which would have been the end product of the proposed construction process was an open-ended pile filled with concrete. Although claimants ’ contention appears clearly correct to this court, the State failed to correct any ambibuity that might exist, since the best that its own witness, Mr. Praeger, could do was to state that as the contract does not expressly designate a method that must be followed, use of the open end procedure is implied.
Next, the State makes much of the fact that both the contract (p. 142) and the specifications (p. 388, par. f.) provide that the unit price bid includes the removal of material from the tube. But in each case it ignores the previous sentence which is of far greater significance since therein is repeated the proposition that it is the contractor who is to choose the method of driving the piles. These references, together with those in the contract referring to alternate driving and cleaning as the anticipated method of installation (pp. 140-141) can logically refer to the mode of procedure to be followed after a resistance of eight to ten blows per inch is reached. Similarly, the reference contained in the specifications (p. 388, par. e) that “the tube in its final location shall be cleaned from its tip to its top ” means just that. "Where the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that the construction be adopted.” (Kiewit Sons’ Co. v. United States, 109 Ct. Cls. 390, 418 [1947].)
In fact, claimants’ proposal literally followed the exact wording of the contract (p. 140) since, in order not to disturb existing foundations, after the afore-mentioned resistance had been reached they intended to shatter the temporary end closure and reduce resistance by water jetting, etc. Finally, note should be taken of the fact that one of the methods expressly designated for use in-the specifications (p. 387, par. e) is that the contractor may ‘ ‘ drive and not clean the tube until it is near its anticipated final position.”
Thus the court finds that the choice of method(s) to be used was one clearly for the contractors to decide, that the language *305 used in the contract and the specifications did not forbid use of a removable end closure, and that the best that can be said for the State’s position is that, while it raises the ¡spectre of ambiguity, as the author of the documents all doubts must be resolved adversely to it.
However, the State has here raised one important issue. Although it misleadingly couches it in terms of whether the State or the contractor has the right and responsibility of designing and constructing, a legitimate question is presented as to whether claimants’ proposed methods would have satisfied the contract design. Mr. Winterberg testified at an examination before trial, which testimony was introduced at trial, of his awareness of the engineering considerations which would enter into making a decision to use open end piles. Acknowledging, although disagreeing with the view that the consideration involved was the prevention of disturbance to existing structures and stating that open end jobs were a rarity, he testified that “in every one of these massive buildings in the City of New York where we drive piles adjacent to the structure right hard up against it, with all its weights and with all its masonry, we often used a closed-end pile and don’t worry about it at all, and I know of no record of failure due to that. I do know of records of failure where open-end piles have been used and there has been a loss of ground that endangered the adjoining building which didn’t happen with a closed-end pile.”
This testimony by Mr. Winterberg, that in his experienced opinion the method proposed was sound engineering, went uncontradicted. In this regard, Mr. Cochran, Assistant Attorney-General, in the course of an exchange with Mr. Pilz, attorney for claimants, stated: “We didn’t tell you it wouldn’t work, Mr. Pilz. We told you not to use it. * * * We didn’t tell you it wouldn’t work.” (Emphasis added.)
Furthermore, this court wishes to note the contents of an article attached to claimants’ verified hill of particulars, despite the fact that its admission in evidence was denied and consequently it forms no part of the basis of this decision. The article written by Mr. Kett, formerly an Associate Civil Engineer for the State of New York and its representative on this job, compared closed end and open-ended piles used in the eight primary Gowanus Expressway contracts. He concluded: “ The original consideration that led to open-end piles was that the driving took place directly adjacent to existing pile caps which were carrying bridge traffic. But the most careful observation failed to detect the slightest influence on the existing structure during driving of either type of pile.” (Emphasis added.) In *306 this regard Mr. Bickston, a State representative and the immediate subordinate of Mr. Kett, testified on cross-examination that at least two other construction contracts on Growanus Parkway had been changed to utilize closed end piles.
Thus the only question remaining is the amount of damages to be awarded. As regards the cleaning of the piles, records were jointly kept with a representative of Madigan-Hyland and the court accepts the audited figure of $351,610.33. However* this must be reduced by the amount of the bid estimate for end closures not incurred of $3,965, for a total of $347,645.33 plus overhead at 10% 'and 10% for profits.
Concerning the claim for the disposal of pile soil, the State at trial sought disallowance of this claim on the grounds that' separate work records were not kept as to the disputed work. However, this court finds that it must agree with claimants that no disputed work records could be kept on this claim because the disputed work could not be separated from the contract work, since both the additional and the contract work were all a part of the same drilling operation. In the words of Mr. Winterberg: “ you continue to excavate to the bottom of the pile. We don’t stop excavation at a point where the pile stopped ten blows to the inch but you excavate right to the bottom. How could we segregate which mud was contract mud and which mud was the claim mud and stuff? ”
The auditor verified and the court finds that the total volume of pile soil disposed was 2,860 cubic yards as compared with a bid estimate of 150 cubic yards or an increase of 2,710 cubic yards. The State introduced no evidence to dispute that the estimated daily unit costs alleged by claimants were other than fair and reasonable. Thus the court awards $11.94 per cubic yard for 2,710 cubic yards for a total of $32,357.40, plus overhead and profit at 10% each.
The final item to be considered is the extra sheeting costs allegedly necessitated because the delays in piling and cleanout slowed the construction of foundations. The need to keep the pile driver moving ahead to progress the job necessitated the construction of more cofferdams than had originally been anticipated. TJncontradicted evidence showed that at least 30 cofferdams were in use between January 9,1961 and October 17,1961 and the auditors verified by means of invoices (billed claimants by weight of sheeting removed) that the amount of sheeting utilized was as alleged by claimants.
As regards their cost, the largest portion of which consisted of the sheeting rental value, claimants introduced a proposal *307 made by a supplier of steel in 'another State contract wherein sheeting was offered at a net figure of $49 per ton per month for the first month and $1.50 per ton per month thereafter. That bid was dated May 23,1962. Some of the steel sheeting on this job was in place until April 9, 1962. Claimants’ figure of $55 per ton is based on a net rental value for a five-month period despite the fact that most of the sheeting was up for at least seven months and, in some cases, twice that length. The State offered no evidence to either contradict claimants ’ figures or to establish independent values. Consequently, the court awards the claimants for rental value, waste, trim, trucking to and from job, as well as loading and unloading from the job site as analyzed in the audit, the sum of $67.40 per ton for 548.2 tons, or $36,948.68 plus overhead and profit at 10% each.
SECOND CAUSE OF ACTION.
Under the contract, alternative provisions were made in the event that the new column anchorages interfered with the existing piles. At an early job meeting all parties agreed to eliminate the first option (revision of column anchorage assemblies), since revisions of such magnitude would delay each and every column base installation and, consequently, the entire project. The remaining option, under which claimants seek recovery, provides for compensation for the cutting and removal of a portion of any existing concrete piles that might interfere with the new column anchorages.
Item 851 of the contract provides as follows:
“ Work. Under this item the 'Contractor shall be required to cut and remove portion of existing tubular cast-in-pl'ace concrete pipes if they should be found to interfere with the new column anchorages. The Contractor shall perform work under this item only at the written order of the Engineer, and the manner and extent of removing the portion of the existing pile shall be in strict accordance with the written instructions which accompany the said order.
‘ ‘ Measurement and Payment. Payment for Cutting and Removing Existing Piles will be made at the unit price bid per each named in the Contract.
‘e The quantity to be paid for under this item will be the actual number of existing piles each of which has a portion cut and removed as ordered by the Engineer.
‘1 The unit price bid for this item shall include the cost of furnishing all labor, materials and equipment necessary to complete the work. (p. 246) (Emphasis 'added.)
*308 As the work progressed, claimants ’ subcontractor discovered that the pile caps, consisting of steel plates, were welded to the existing concrete piles. Because these plates were not centered on the piles, nor was their location or geometry discernible from the contract drawings in the opinion of Mr. Bruschi, the acting engineer in charge of the consulting engineers, and because of the State’s decision that all anchor bolts be installed in the exact locations shown on the contract plans, claimants (allegedly with the consent of the field engineers) were required to remove portions of some 382 tubular cast-in-place concrete pipe piles. Although the State certified payment for 51 of these cuttings, it failed to certify for payment the remaining 331 piles cut, claiming that the pile cap is not a part of the pile compensable as “ a portion cut ’ ’ under the provisions of Item 851.
Despite the State’s contention that Item 851 applies only to the cutting of the pipe itself, it introduced no evidence to contradict the testimony of Mr. Winterberg that the pile cap was a part of the pile. To this court the provisions of Item 851 are clear and permit recovery at the unit cost (of $100) per pile cut without regard as to whether or not that which was cut was the pipe proper or something permanently attached thereto, as was the case here by means of a welding. After all, the intent was to have the piles level. What was to be removed was to 'attain that end. The contract makes no provision for removal of caps as such. Therefore, were the court to accept this hairsplitting proposal advanced by the State, the result would be to make the pipe level where only the cap was to be removed, without compensation within the contract terms. The record does not indicate that that result was contemplated by either party to the contract and it may not be permitted by the court. The caps as set were a part of the pile. Any portion of the pile which was cut off from the pile, in the opinion of the court, met the requirements of the contract and made the State liable for the unit cost of $100. This, very likely, seemed to the State to be an easy bonanza for the contractor. Whether it was or not, it met the requirements for payment as provided in the contract. At best, the 'State here is attempting to introduce an ambiguity which can only be resolved against it as the author of the instrument.
Additionally, the contract under which the original piles in issue here were driven provides that the cap plate shall be paid for as part of the pile. Also to be considered is the fact that the catalog of the National Tube Company, a recognized fabricator and a subsidiary of the U. §. Steel, presents as representa *309 tive the New York City Public Works Specifications that the unit price for closed end piles includes the cap plates.
While it is correct that no daily disputed work records were kept, there is little room for doubt that the work was ordered done and it is uncontradicted that the pile cap plates were in fact removed. ‘' Where * * * the evidence of a party to the action is not contradicted by direct evidence, nor by any legitimate inferences from the evidence, and it is not opposed to the probabilities; nor, in its nature, surprising, or suspicious, there is no reason for denying to it conclusiveness.” (Hull v. Littauer, 162 N. Y. 569, 572.) Under these circumstances, claimants logically could have assumed that they would be paid at the unit price for pile cap plates removed without the necessity of keeping additional disputed work records.
One final point must be considered. In accordance with Item 851, claimants on several occasions requested written authorization to remove the pipe pile caps. Madigan-Hyland denied receipt of any of these letters with the exception of one sent after the completion of the disputed work, at which time it denied payment. Thereupon claimants protested this decision to the Department of Public Works, which responded that “ we do acknowledge your letter as your notice to us of the ‘ Disputed Work ’ provision of the contract.” Since untimely notice is the equivalent of an absence of notice, acceptance of claimants’ letter to the State as notice can mean only that even if there is any doubt as to whether the earlier letters to Madigan-Hyland were ever sent ('although this court holds as a fact that they were sent), any prejudice arising as the result of a delay in the service of notice was waived.
Accordingly, the court awards claimants damages in the sum of $100 per pile for 331 piles, or a total recovery of $33,100.
THIRD CAUSE OE ACTION.
This claim requires a minimum of discussion, a belief apparently shared by the State since it has neither submitted findings of fact thereon nor mentioned same in its brief after trial. The dispute here arose when claimants were notified by Madigan-Hyland that Item 76 of the specifications, entitled “Maintenance and Protection of Traffic,” required that the surfaces of traveled road which contained mounds and depressions were to be filled with bituminous patching. Claimants objected, stating that the contract provided no unit price for the furnishing of such patching material. Madigan-Hyland replied that *310 although it would recommend payment for the cost of materials used, the cost of labor was covered by Item 76S of the contract. Claimants refused and performed the work under protest and now seek recovery of the entire amount.
Here again the court finds itself in agreement with the claimants. When considered in their entirety, it is clear that the contract and the specifications envision that the contractor is to correct mounds and depressions on the traveled way caused as a result of work performed by him and not as a result of extraneous factors, such as winter weather affecting the existing pavement as in the case at bar.
Accordingly, claimants are entitled to recover the sum of $4,261.50 paid to Sicilian Asphalt Paving Co., but are only entitled to 5% profit since the work in contention was performed by a subcontractor.
FOURTH AND SIXTH CAUSES OF ACTION.
For convenience, these two causes of action will be dealt with simultaneously. Recovery here is sought for Uniform Watchmen Services provided under Item 601 for the protection of the general public and for a deduction for watchmen not provided but allegedly required under Item 76S for the maintenance and protection of traffic. The State’s auditor was unable to determine whether the watchmen services furnished were provided under Item 601 or under Item 76S of the contract.
Nevertheless, the audit did show that a total of 4,893.25 man days of uniformed watchmen’s services had been provided, of which only 3,843 man days had been paid for by the State, allegedly in accordance with the final estimate. Closer inspection of this exhibit reveals a total of 2,423 additional man days performed which even Mr. Bruschi was forced to admit.
However, since as to the fourth cause of action claimants seek recovery for only the difference between the audited figures and the final estimate of 1,050.25 man days at the contract price of $20 per man day, the court accepts the latter total and finds claimants entitled to the sum of $21,005 for Uniform Watchmen Services provided under Item 601 of the contract.
As regards the sixth cause of action, the State contends that it was the responsibility of the claimants to provide watchmen under Item 76S in addition to that required by Item 601. On the other hand, claimants contend that the payment for watchmen is to be made separately under Item 601 and does not fall under the lump sum payment for Item 76S. Item 76 of the specifications in relevant portion provides as follows:
*311 “ a. Work. Under this item the Contractor shall maintain traffic for the duration of the contract and protect the traveling public from all damage to person and property within the limits of and for the duration of the contract in accordance with the plans and specifications and as directed.
“ b. Method of Maintaining and Protecting Traffic. * * *
‘1 So that traffic will be adequately maintained and protected, the Contractor shall perform the following additional requirements subject to the approval of the Engineer. * * *
‘' 10. Provide at least one night watchman for the continuous patrol of the contract. * * *
“ c. Measurement and Payment. Payment will be made at the lump sum price bid for this item. The price bid shall include the cost of furnishing all labor, materials and equipment necessary to complete the work. However, if the items are included in the proposal, Furnishing Water Equipment, Furnishing and Applying Water, Furnishing and Applying Calcium Chloride and' approved bituminous patching material will be paid for under their respective items.” (Emphasis added.)
The court rejects claimants’ original contention, that the mere presence of Item 76S in the contract supersedes the applicability of Item 76 in the specifications, as contrary to settled law and the express wording of the contract and its alternative position, that separate payment for watchmen’s services under Item 601 is contemplated, as contrary to both a fair reading and, again, the express wording of Item 76. Failure to include Uniform N"ight Watchmen as an item for which separate payment is to be made when other items are listed for such treatment can only mean that payment thereof is included in the lump sum figure.
However, it is equally clear, as Mr. Bruschi admitted, that certain deductions made for uniformed watchmen’s services were improper. These include a period of 79 days (from April 8, 1960 to July 6, 1960) deducted for watchmen not provided even though actual work had not commenced as well as a period of 390 days (from Dec. 3, 1963 to Dec. 27, 1964) deducted even though the final estimate showed that all work had already been completed (and despite the fact that even the State considered that actual work had been completed no later than September 21, 1964, or an admittedly improper deduction of at least 97 days).
SEVENTH CAUSE OE ACTION.
In this cause of action, claimants seek recovery for delays allegedly arising as a result of the nonperformance by the State of its contract duties and as a result of the execution of a sup *312 plemental agreement. Although the contract did not require completion until May 1, 1963, and the progress schedule did not show that completion was anticipated until the first week in February of 1963, claimants seek recovery for being prevented by the afore-mentioned delays from completing their work by November of 1962. This delay was the result of a failure by another general contractor for the next portion of the Growanus Parkway (FIGLE 61-1, also known as Contract 3) to complete his work at a date early enough to allow claimants to finish their work on the northern portion of this contract (FIGLE 60-2) at the expected date.
The law of New York is clear that where the State unjustifiably interferes with a contractor’s progress so as to cause needless delay, such delay is compensable even though all contract work was completed by the date specified in the contract. (Shore Bridge Corp. v. State of New York, 186 Misc. 1005, affd. 271 App. Div. 811.) However, research has disclosed no case in which the gravamen of the delay claim is noncompletion by an expected date earlier than the contract completion date as a result of delays occasioned by the State’s failure to provide work under a contract, such as the afore-mentioned, at a time convenient to the contractor. Although it would seem clear that under certain circumstances recovery on such a basis would be granted, both the express wording of the proposal as well as the circumstances here present preclude any recovery.
First, as to the delays allegedly arising as a result of the State’s nonperformance of its contract duties, we would initially point out that Contract 3 was not let until May 25,1961, approximately one year after the date of this contract. Thus, it is unreasonable to expect that a contract of equivalent complexities was to be completed in far less time than had been available to claimants. This is especially true in light of the provisions of the contract. Although claimants correctly point out in their brief that courts have readily struck down exculpatory clauses in public construction contracts, some identical in wording to this contract, claimants have failed to grasp the significance of Town & Country Eng. Corp. v. State of New York (46 N. Y. S. 2d 792). Although this case deals with delay as the result of site unavailability, a portion of it has been cited to us by claimants as controlling. It reads (p. 800): “ The contractor was entitled to a reasonable opportunity to perform his contract without obstruction or interference, and the State is liable for the failure to furnish that opportunity unless by express language in the contract, it has relieved itself from such liability. (Emphasis added.)
*313 However, claimants have overlooked the fact that the State, probably because of the late date on which Contract 3 was let or for whatever reason, inserted a specific provision that the work on which the completion of claimants’ contract work depended might be delayed. Page 136 of the contract provides that “ it is expected that the contract to the south (Contract 5) will run concurrently with this contract, while the contract to the north (Contract 3) may not he so progressed.” (Emphasis added.) ,
This provision, when read with other portions of the contract which provide, for example, that ‘ ' it may not be possible to perform the construction operations of this contract in the most efficient and orderly manner, ’ ’ shows that this anticipated delay (which lasted only until Dec. 7, 1962) was clearly a part of the basis of the bargain. Recovery does not lie " where the hindrance is due to some action of the promisor which under the terms of the contract * * * he was permitted to take ”. (11 Williston, Contracts [3d ed.], § 1296, p. 59.)
Second, as to the delays arising as a result of the execution of the supplemental agreement, it is clear that claimants had to halt a portion of their work on April 12, 1962 to allow for the incorporation of certain revisions desired by the City of New York. It is equally clear that although claimants received a letter, together with appropriate drawings, on August 14, 1962, authorizing the work, with the exception of some minor items no real progress was begun until March of 1963. Although the reason given for the failure to complete the work specified in the supplemental agreement was the fear that work could not be completed prior to the winter closing of the asphaltic concrete plants, Mr. Winterberg testified that the work might have been completed in approximately 90 days. This would be in mid-November and, in the opinion of the court, was sufficient time to complete this phase of the contract. Additionally, Mr. Winterberg admitted that the Sicilian Asphalt plant would remain open throughout the winter on a reduced basis of operation. Thus, even if claimants reasonably might have anticipated completing the contract by November of 1962, their own inactivity in completing the supplemental agreement precludes any recovery on a delay basis against the State.
Furthermore, claimants were woefully negligent in finally completing the contract work. Although the contract was 99.5% complete by November 1, 1963, from November 19, 1963 to July 30, 1964 there was a complete absence of any punch list activity. The State acted within its rights in charging for engineering and inspection costs after December 1, 1963.
*314 CONCLUSIONS OF LAW
I. The State’s breaches of contract resulted in the following additional costs to claimants:
FIRST CAUSE OF ACTION

Cleaning Piles:

Additional Cost of Cleaning Piles.....$351,610.33
Less Cost of End Closures not Incurred 3,965.00
347,645.33
Overhead at 10%.................... 34,764.53
382,409.86
Profit at 10%................... 38,240.99 $420,650.85

Soil Disposal-.

Cost of 2860 cu. yds. at
$11.94 per cu. yd................. 34.148.40
Less Bid Estimate of 150 cu. yds.
at $11.94 per cu. yd.............. 1,791.00
Increased Cost of 2710 cu. yds.... 32.357.40
Overhead at 10%............... 3,235.74
35,593.14
Profit at 10%............... 3,559.31 39,152.45

Sheeting Costs:

Additional Cost of 548.2 tons
at $67.40 per ton............ 36,948.68
Overhead at 10%........... 3,694.87
40,643.55
Profit at 10% 4,064.36 44,707.91
SECOND CAUSE OF ACTION
331 piles at $100 per pile.......................... $33,100.00
THIRD CAUSE OF ACTION
Sicilian Asphalt Paving Co........... $4,261.50
Profit at 5%....................... 213.08 4,474.58
*315 FOURTH cause of action
1050.25 man days at $20 per man day............ 21,005.00
FIFTH CAUSE OF ACTION
Withdrawn
SIXTH CAUSE OF ACTION
79 days x 16 man hrs. per day = 1,264 man hrs. x $1.15 per hr. =........................$1,453.60 plus 17.9869% ins. on labor = 261.46 $1,715.06
390 days x 16 man hrs. per day = 6240 man hrs. x $1.30 per hr. =.......................$8,112.00 plus 18.6119% ins. on labor = 1,509.80 9,621.80 11,336.86
SEVENTH CAUSE OF ACTION
Recovery Denied
Recovery allowed for a total of.................. $574,427.65
II. Claimants are entitled to recover judgment against the State of New York in the sum of $574,427.65, with interest from March 28, 1965, a date three months after the date of the acceptance of the contract, to the date of entry of judgment herein, and also interest on $369,159.88, the amount awarded in the severance action, from March 28, 1965 to the date of payment of the severed judgment (A. E. Ottaviano, Inc. v. State of New York, 32 A D 2d 87 [3rd Dept., 1969]), together with interest on that interest on the severance judgment, if unpaid, from the date of the severance judgment to the entry of judgment herein.