The **INGALLS IRON WORKS COMPANY**, a corporation, Plaintiff,

v.

**FEHLHABER CORPORATION** et al.,
Defendants.

No. 68 Civ. 1445.

United States District Court,
S. D. New York.

May 19, 1971.

---

McChesney & Kenney, Troy, N. Y., for plaintiff by Thomas V. Kenney, and John W. MacDonald, Troy, N. Y., of counsel.

Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., by C. V. Stelzenmuller and William K. Murray, Birmingham, Ala., of counsel, for plaintiff.

Norton, Sacks, Molineaux & Pastore, New York City, by Charles B. Molineaux, Jr., Stewart M. Levine, and Henry N. Christensen, Jr., New York City, of counsel, for defendants.

## FINDINGS AND OPINION

POLLACK, District Judge.

Jurisdiction herein is based on diversity of citizenship and requisite amount in controversy.

This litigation results from a series of commercial transactions connected with the construction of a section of the Gowanus Expressway in Brooklyn, New York, hereafter called the "Gowanus Job". What began as an innocent sale of structural steel by the plaintiff to the project, evolved into a very complex controversy that has festered and dragged on for more than a decade. After numerous negotiations and agreements spanning several years, the parties proceeded to a variety of litigation in the state and federal courts. Until now, none of these have resulted in complete satisfaction to the plaintiff for the materials supplied. The extended submissions to this Court make it understandable why Chief Judge Foley stated at an earlier stage of this litigation "that it seems inconceivable so much case law and text discussion could arise from a simple factual base, namely, the supply of steel by the plaintiff manufacturer-supplier to a highway improvement and construction job." Ingalls Iron Works Co. v. Fehlhaber Corp., 275 F.Supp. 623, 624 (N.D.N.Y.1967).

### I. Background

Plaintiff, hereinafter called "Ingalls", is a corporation organized and existing under the laws of the State of Delaware,

with its principal office and place of business at 620 Fourth Avenue South, Birmingham, Alabama. Plaintiff is and at all material times has been duly qualified to do business in the State of New York since November 4, 1931. Defendant Fehlhaber Corporation, hereinafter called "Fehlhaber", is a corporation organized and existing under the laws of the State of New York and has its principal place of business at New Rochelle, New York. Defendant Terry Contracting, Inc., hereinafter called "Terry", was "dissolved by proclamation" in December, 1969 for failure to pay its franchise tax, but it continues to exist as a corporation organized and existing under the laws of the State of New York for the purposes of this civil action; it formerly had its principal office and place of business at 11–11 34th Avenue, Long Island City, New York. Defendant Fehlhaber-Terry, a joint venture, hereinafter called the "Joint Venture", was formed in 1960 by Fehlhaber and Terry to undertake the Gowanus project and continues to exist for the purposes of this civil action. Terry had done business with Ingalls prior to 1960.

Also named as defendants originally were two bonding companies, Aetna Casualty and Surety Company (Aetna), American Employers Insurance Company (American Employers), and X, Y, and Z, transferees of funds allegedly due plaintiff. These bonding companies are no longer before the Court. There has been no identification herein of X, Y and Z.

Ingalls brought this action in the United States District Court for the Northern District of New York in 1965.

The complaint alleged three counts. As we shall see, the third was dismissed before trial and the remaining two were tried. The first and most vigorously prosecuted one is for enforcement of a New York statutory trust. The complaint asserts that the Joint Venture entered into a construction contract with the State of New York for the construction of a public highway improvement; that Terry on behalf of the Joint Venture arranged for the purchase from the plaintiff of designated structural steel items; that a trust relationship arose by virtue of Article 3–A of the Lien Law of the State of New York, §§ 70 et seq., wherein the Joint Venture and its members as the "contractor" on the Gowanus Job were statutory cotrustees and the plaintiff was a statutory beneficiary.

The second count, premised on the same allegations as the first, is for enforcement of an express trust established, allegedly for plaintiff's benefit, by the Joint Venture agreement.

The third count, again based upon the same allegations, was for breach of labor and material bonds given by Aetna and American Employers to Fehlhaber, Terry, and the Joint Venture guaranteeing prompt payment due to all persons supplying the contractor on the Gowanus Job or a subcontractor with labor and materials employed and used in carrying out the contract.

The complaint seeks in substance, to compel an accounting by the various defendants named herein; to identify and recover trust assets; to set aside any unauthorized payments, assignments or other transfers of trust funds; to enjoin further diversions of trust assets by Fehlhaber or Terry; and to recover damages for breaches of trust. The complaint also seeks to fix the amount of plaintiff's trust claim at $1,601,377.62 and demands a judgment therefor against the defendants in said sum with interest from November 28, 1960.

The defendants Fehlhaber and the Joint Venture denied liability and asserted the bar of the statute of limitations as a further defense. Additionally, these defendants counterclaimed against plaintiff for damages for wrongful filing of spurious liens alleged to have occasioned harm to the said defendants.

The said defendants asserted a cross-claim against defendant Terry for judgment over against it in the event that any judgment is obtained against them since, they say, their liability could arise only out of Terry's violations of the Joint Venture Agreement.

Defendant Terry appeared and filed an answer to the complaint (not to the cross-claim), but presently is in default. Terry did not appear and was not represented at the trial.

Summary judgment dismissing the complaint as to all defendants except Terry was requested in the early stages of the litigation. Judge Foley granted summary judgment as to the third count, enforcement of the labor and material bonds, since the applicable New York law required allegation and proof of the filing and enforcement of a mechanics lien as a condition precedent. 275 F.Supp. at 628. This Ingalls could not do. *See* Ingalls Iron Works Co. v. Fehlhaber Corp., 24 N.Y.2d 862, 301 N.Y.S.2d 95, 248 N.E. 2d 923 (1969), aff'g, 29 A.D.2d 29, 285 N.Y.S.2d 369 (1967).

Judge Foley refused to grant summary judgment to the defendants as to the rest of the complaint on the ground that there were many issues of fact in a confused situation which must be resolved in order to deal with the complicated questions of law. 275 F.Supp. at 627. Following this ruling, and in October 1967, the defendants Fehlhaber and the Joint Venture moved for change of venue of the action, to transfer the suit from the Northern District to this District pursuant to 28 U.S.C. § 1404(a). The motion was granted on April 3, 1968 and in this District, because of the complexity of the suit, it was assigned, pursuant to local Calendar Rule 2, to one judge for all purposes.

The events here began innocently enough when the State of New York decided to do a number of improvements on the Gowanus Expressway in Brooklyn for which substantial construction contracts would be let. Terry's president, Richard Terker, approached Fehlhaber's chief engineer, Samuel Winterberg, about bidding jointly on one of the contracts. The two firms would be complementary in the contemplated work of foundation strengthening and viaduct widening. At that time, Terry was recognized as one of the best steel erection concerns in the New York area and Fehl-

haber specialized in heavy foundation construction work. Fehlhaber and Terry had never collaborated and as it turned out never did again.

On January 27, 1960, Fehlhaber and Terry signed a "Prebidding and Joint Venture Agreement" under which they agreed to prepare and submit jointly a bid for contracts F.I.G.E. 60–2 and F.I. G.E. 60–3 relating to the Gowanus Expressway improvements. Under the agreement, the parties constituted themselves as joint venturers for, and only for, the performance of the Gowanus Expressway contract awarded to them.

On March 17, 1960, the Joint Venture formally submitted a bid to the State of New York for contract F.I.G.E. 60–2, approximately eight-tenths of a mile of expressway, from 20th Street to 36th Street along Third Avenue in Brooklyn. In order to prepare its bid, the Joint Venture had asked for a number of price alternatives from prospective subcontractors and materialmen including Ingalls. On March 21, 1960, a letter of intent was sent on behalf of the Joint Venture to Ingalls specifying prices and quantities of steel which the Joint Venture intended to order when the Joint Venture received the award of a formal contract by the State of New York. On March 25th Ingalls addressed an acknowledgment of the letter of intent to the Joint Venture, referring to the letter as an award contingent upon the receipt of the formal contract. On March 30th Ingalls confirmed to the Joint Venture the standard terms applicable to the order reciting that the full contract price of the materials would be due and payable on the tenth of the month following shipments.

The contract with the State for a total amount in excess of $11-million was formally awarded to the Joint Venture on April 8, 1960, and a formal agreement entered into. The Joint Venture thus became the "contractor" on the Job.

A formal joint venture agreement superseding the earlier "Prebidding and Joint Venture Agreement" was signed on May 10, 1960. The Joint Venture

leased offices and began work on the project.

By an arrangement made between themselves and contained in the Joint Venture Agreement, the joint venturers allocated the work being undertaken in the name of the Joint Venture. Fehlhaber assumed responsibility for certain aspects of the Job, such as the pipe for piling, while Terry assumed responsibility for other items, such as the procurement and installation of the structural steel. Following this out, when payment requisitions submitted to the State produced payments to the Joint Venture for materials supplied, the Joint Venture was to deposit the money in a Joint Venture account and was required then to make payment to Terry or to Fehlhaber as the case might be so that the venturer supervising the particular supplier would then receive payment from that venturer. These arrangements of the venturers *inter sese* were not communicated to Ingalls in connection with the order for the steel. Moreover, as we shall see later, such arrangements are in derogation of the purposes and objects of the Lien Law.

The steel was sold to the State of New York, F.O.B. Ingalls' fabricating plants in Alabama and Pennsylvania. It was then to be shipped to the Job in New York City consigned to the State of New York, c/o Terry Contracting, Inc. Three million dollars of steel was involved in the Job.

Beginning in July 1960 there were numerous communications between the parties about the method of payment for the steel being furnished. Ingalls, of course, preferred to be paid as soon as possible. Terry (as was later to become obvious) had neither the capital nor access to credit to pay Ingalls such enormous sums prior to receiving payment from the State.

Some time prior to September 1960, discussions took place between Ingalls and representatives of Terry relative to obtaining progress payments from the State of New York as soon as steel for this Job was delivered from the mills to Ingalls' fabricating plants. On Joint Venture letterhead, a communication was addressed to the State's Supervisory Engineers, Madigan-Hyland, listing items of steel totalling more than $308,-000 invoiced by Ingalls to Terry as having been delivered from the mills to the fabricating shop and requesting payment on the ground that "under the terms of the specifications, payment will be made under these items for the furnishing of such materials and delivering to the shop for fabrication".

On October 4, 1960, Madigan-Hyland wrote to the New York State Department of Public Works advising it of the request for payment for steel delivered to the fabricating shop and quoting the specifications and interpreting them to mean that payment would be made as the material was delivered to the shop for fabrication.

On November 29, 1960, the State Department of Public Works wrote Madigan-Hyland its decision that partial payment would be made to the *contractor* upon delivery of steel to the shop for fabrication. On November 30, 1960, the Joint Venture was notified that items delivered to the Ingalls' fabricating shop would be included in the estimate submitted to the State for payments and that "it will be necessary for us to receive detailed receipted bills furnished by *your* [the Joint Venture's] supplier".

On December 8, 1960 Ingalls having been notified of the contents of Madigan-Hyland's November 30th letter stated that in order for Ingalls to furnish receipted copies of invoices Terry should furnish it first with letters acknowledging that marking "Payment Received" on the invoices and passing of title to the steel would be "subject to the condition subsequent that payment should be made by us to you for said steel within a reasonable time". In response to this, on December 22, 1960, Ingalls received a telegram from the project engineer of Terry acknowledging that Ingalls' invoices to Terry for material although stamped paid in full were in fact not paid; that the stamp was applied only for the convenience of expediting partial

payments and that the only evidence of payment would be canceled checks referring to the subject invoices.

Ingalls then submitted five receipted invoices totalling $638,776.59 and other receipted invoices were similarly sent from time to time thereafter. These invoices were transmitted to Madigan-Hyland for inclusion in estimates to the State, the letter of transmittal in each case being on Joint Venture letterhead and signed for the Joint Venture by Bernard Lippe, the project engineer.

Madigan-Hyland forwarded the estimates to the Department of Public Works with letters of transmittal containing the language that the estimates covered work performed by the contractor under the contract and enclosed paid invoices with mill invoices attached received from the contractor. Madigan-Hyland states that this material was included in the estimate in accordance with instructions of the Department of Public Works of November 29, 1960.

So far as the receipted invoices from Ingalls were concerned, it was clearly understood by the parties hereto that the steel was not yet shipped to the job site but was in Ingalls' plant for fabricating. Moreover, the invoices had not in fact been paid and the "paid in full" stamp was applied by Ingalls only for the convenience of procuring advance payments from the State. However, Fehlhaber assumed (incorrectly) that the money for the steel that was so obtained from the State by the Joint Venture and was then turned over to Terry was being paid by the latter to Ingalls and that the receipted invoices were being satisfied accordingly. The first such receipted invoices were issued on December 22 ,1960. Ingalls expected to be paid 90% of the invoices' face amount (*i. e.*, the full amount less the State's ten percent retention) by the middle of January 1961.

Unfortunately, Ingalls did not receive the money it expected in January. On January 17, 1961 Ingalls was told by Terry that no money had been received from the State relating to the steel furnished by Ingalls but that $105,000 was

expected shortly; $105,669.31 was paid to Ingalls on January 31st. Terry told Ingalls that because of unexpected job expenses it had incurred, time and indulgence would be needed to pay further sums. Actually, Terry received nearly $500,000 on January 23, 1961 from the Joint Venture which was substantially for the Ingalls steel.

The total amount of the receipted invoices given by Ingalls appears to be approximately $919,700. The State of New York paid the Joint Venture a total of $827,793 (90% of $919,770) for the steel referred to in these receipted invoices.

The facts are that in 1961 Terry diverted in excess of $1,500,000 of the money it received from the Joint Venture; this was inclusive of the amounts represented by the receipted invoices payable to Ingalls. Terry was engaged on jobs other than the Gowanus project and diverted funds generated on one job to pay general creditors or suppliers on other construction jobs—a form of pyramiding.

Ingalls learned to its surprise during 1961 that Terry was in financial trouble. Fehlhaber was unaware at this time of Terry's diversions or that the receipted invoices obtained from Ingalls were not actually resulting in payments made to Ingalls by Terry.

In March 1961 Ingalls was presented by Terry with a plan for financing the amounts overdue to Ingalls. Terry proposed certain arrangements with a Buffalo contracting firm to be financed by a Buffalo bank. The proposals were considered at meetings held at Ingalls' office in Birmingham and discussed with Ingalls' New York attorney in New York and were found unacceptable.

Alternative arrangements were proposed and in April 1961, Ingalls entered into a special arrangement for the extension of credit to Terry for steel already delivered to the project and steel on the way. The special agreement provided an extension of credit to Terry up to the sum of $1,500,000. Ingalls was to be paid $150,000 per month beginning on

September 15, 1961 until the full $1.5-million was paid. For this accommodation Ingalls was to receive the personal, primary and unconditional guaranty of the president of Terry, Richard D. Terker, of the $1,500,000, and Terry was to pay Ingalls $100,000, to be paid at the rate of $10,000 per month beginning July 15, 1961. A fee was also to be paid to Ingalls' attorney which he fixed at $10,000.

The background for this alternative agreement was Terry's original plan to arrange that the steel required for the project be purchased from Ingalls by the Buffalo contractor who would give Terry extended payment terms for which Terry would pay $100,000. Instead Terry worked out the deferred payment schedule mentioned above with Ingalls for which the latter was to be paid the $100,000. Thus, Ingalls would perform the same function for Terry as it sought from the Buffalo concern and Ingalls could thereby make $100,000 beyond what the steel contract called for.

The April 1961 agreement was set up on paper as a contract to be signed by Terry on behalf of the Joint Venture, although Terker told Ingalls' representative that he did not have authority to bind the Joint Venture to such an arrangement. Ingalls' representative told Terker it was proper for him to sign it in that form and he did.

Terker signed the agreement for Terry and ostensibly for the Joint Venture but it is clear that Terry had neither actual nor apparent authority to act alone for the Joint Venture in such a matter and Fehlhaber knew absolutely nothing about the existence of the agreement at the time it was made. Terry was not represented by an attorney in connection with the negotiation or execution of this extension agreement. In effect, the agreement was a loan to Terry of trust funds of the Venture payable to Ingalls.

Terry failed to make the first, second or third payments of $150,000 scheduled to be made to Ingalls under the April 1961 agreement. At about these times,

in an effort to raise money, Terry filed a statement for a $1-million securities issue with the Securities and Exchange Commission. This filing was approved on or about September 25, 1961 but no money was raised thereby. Ingalls may have expected to receive money from this source. Meanwhile, Ingalls took no action to enforce the default provisions of the April 1961 agreement, it gave no notice to the State, it filed no lien, it did not even give notice to Fehlhaber, but it did continue to furnish steel to the Job through October and November 1961.

In November 1961 Terry first disclosed to its partner Fehlhaber that the Ingalls account was deeply in arrears. This disclosure occurred when Terry asked for and Fehlhaber questioned an early distribution of Joint Venture profits to Terry. Terry's president then told Fehlhaber, on November 22nd, that he urgently needed $100,000 which he owed to Ingalls, but Fehlhaber expressed his doubt of this and told Terker to meet him the next day. Meanwhile, by some telephoning to representatives of Ingalls, Fehlhaber ascertained that the Ingalls' account was in arrears to a very substantial amount. When Terker met Fehlhaber the next day, he told the latter that he owed Ingalls $113,000 [sic]. Fehlhaber offered to advance money from the Joint Venture to Terry provided that Terry brought in to Fehlhaber checks made out to Ingalls from Terry, to be mailed by Fehlhaber to Ingalls. The evidence is that Terry made out a check to Ingalls for $113,000 [sic] and Fehlhaber signed a Joint Venture check to Terry for $100,000 and the check to Ingalls was mailed from Fehlhaber's office.

Quite understandably Fehlhaber wanted to know immediately what had been going on and as the facts began to come out Fehlhaber learned of the April 24, 1961 agreement made by Terry with Ingalls. Toward the end of November or in December 1961 Fehlhaber took over the books of Terry so far as payments on the Gowanus Job were concerned and took over the control of the disbursement of funds.

On December 6, 1961, Ingalls notified Terker of the September 15th default and made demand on him for payment pursuant to his personal guarantee of April 24, 1961. This yielded no results for Ingalls.

A series of discussions which drew in all parties ensued. A principal concern of the parties was the completion of the construction job and negotiations were had concerning this matter. Ingalls continued to furnish steel in the interim without receiving any payments although the Joint Venture continued to receive payments from the State therefor. Beginning February 26, 1962 the Joint Venture (Fehlhaber) refused payments to Ingalls. The money on hand received from the State between November 1961 and April 1962 had accumulated to nearly $168,000. Fehlhaber's representatives had told Ingalls that the anticipated profits to the Joint Venture on the Job were expected to be $1-million. This, if true, would indicate a source available to Terry from which to make good to Ingalls on the April 1961 agreement. However, Fehlhaber failed to disclose that $200,000 on account had been advanced to Terry already and a like amount to Fehlhaber, contrary to the Joint Venture agreement which provided that distributions would await the termination of the venture.

A series of agreements whose effect and validity are now hotly contested were ultimately signed in March and April 1962 by which Terry, with Fehlhaber's consent, assigned to Ingalls all its pecuniary interests under the Joint Venture agreement in the project and payment for steel thereafter delivered to the project was promised to Ingalls. The latter agreed not to file a lien against the project with respect to the amount of $1,500,000 of furnished steel which had been the subject of the April 24, 1961 agreement and Ingalls released Fehlhaber and the State from any liability with respect to the furnishing of that $1.5-million of steel. The agreement reserved Ingalls' rights under Article 3-A of the New York Lien Law with respect to funds received by Terry from the Joint Venture. Pursuant to these agreements Fehlhaber paid over $273,000 to Ingalls which was less than the amount past due.

Certain payments were made to Ingalls in 1962 and 1963. The work on the Job was completed some time later, near the end of 1964. In May 1965 the Joint Venture received $236,000 from the State representing part of the retentions, but Fehlhaber refused to pay this to Ingalls claiming that the Joint Venture had overpaid Terry the sum of $204,444.81 and that Fehlhaber's right to reimbursement was superior to any interest of Ingalls therein. Fehlhaber told Ingalls it intended to apply the entire $236,000 to pay other subcontractors and much of it was so used.

In June 1965 Ingalls filed mechanics liens for the $1,500,000 due from Terry under the April 1961 agreement as well as for additional sums due Ingalls apart from that amount and Ingalls served notice under N.Y. Lien Law § 12. In October 1965, this action for an accounting was filed.

The plaintiff's claims litigated herein are premised under N.Y. Lien Law Article 3-A, § 70 et seq.[1] The statute is designed to protect contractors, subcontractors, materialmen, and the like from failing to receive payment for work done when money earmarked for payment is diverted to other uses; it is supplementary to any right to file liens. § 79.

The law imposes a trust upon the funds received by a contractor under or in connection with a contract for a public improvement. §§ 70(1), 70(6). The trust continues with respect to every asset of the trust until every trust claim arising at any time prior to the completion of the contract has been paid or discharged, or until all such assets have been applied for the purposes of the trust. § 70(3). In general, trust assets can be used by the contractor only for the performance of the contract, i. e.,

---

1. Hereinafter section references refer to the N.Y. Lien Law.

paying, for example, subcontractors, materialmen, taxes, unemployment insurance, and surety bond premiums. § 71 (2) Permissible recipients are called beneficiaries. § 71(4) Any transaction by which a trust asset is paid or transferred for any nontrust purpose is a diversion, § 72(1), for which the trustee has absolute liability like a common law trustee's fiduciary duty. §§ 72(1), 77 (1) Possible relief available to a beneficiary includes the right to compel an accounting, to enjoin a diversion, and to recover damages for breach of trust. § 77(3)(i)

It was agreed by the parties, with the approval of the Court, that the trial of the question of liability, that is, of the right to an accounting and the legal principles governing the same and the scope thereof, should be separate from the trial of the question of damages or amount due. Consequently, this opinion and the findings of facts and conclusions of law herein will determine the issue of general liability and will set out the rules to be followed in the accounting.

## II. Statute of Limitations

At the outset is the defendants' vigorous argument that any recovery under the New York Lien Law is barred by the one year statute of limitations. "No such action shall be maintainable if commenced more than one year after the completion of such improvement. * * " § 77(2) The state statute is applicable here. Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

The gist of defendants' argument is that the Joint Venture's contract with the State called for a completion date of May 1, 1963. The project was delayed through no fault of the contractors and the completion time was extended to September 21, 1964. Pursuant to N.Y. Highway Law § 44 the contract with the State provided that the District Engineer shall recommend to the Superintendent of Public Works acceptance of the project after its completion.

The project was inspected on September 29, 1964 and certified as completed on that date in accordance with the plans and specifications. It was accepted on December 28, 1964.

The defendants contend that possibly an even earlier date is applicable on the question of limitations of time to sue. They point to a sworn statement by the State's consulting engineers which allegedly states that work on the project was completed prior to September 22, 1964. Defendants then argue that since the instant suit was not begun until October 11, 1965 which was more than one year after September 29, 1964, it must fail for untimeliness as a suit under the Lien Law. Defendants further contend that Ingalls cannot argue that the word "completion" in § 77(2) has a different meaning from the same word in N.Y. Highway Law § 44 and that in another suit between these parties in the state court involving the date of the acceptance of the job by the State, an incidental statement was made by the Court that the work on the project was completed on September 29, 1964. Ingalls Iron Works Co. v. Fehlhaber Corp., 29 A.D.2d 29, 285 N.Y.S.2d 369 (1967), aff'd without opinion, 24 N.Y.2d 862, 301 N.Y.S.2d 95, 248 N.E.2d 923 (1969).

Ingalls answers these contentions by saying that the project was not fully completed but only substantially so on September 29, 1964, and this is insufficient to trigger the operation of limitations of time to sue under the Lien Law. E. g., Milliken Bros., Inc. v. City of New York, 201 N.Y. 65, 94 N.E. 196 (1911); Biondo v. City of Rochester, 18 A.D.2d 78, 238 N.Y.S.2d 7 (1963). Madigan-Hyland, Inc., issued a letter on November 19, 1964 stating that all work was not completed on September 21, 1964 and had not been completed as of the time of the letter. In addition, the evidence shows that further work (called "punch list work") was actually performed, off and on, between September 1964 and November 17, 1965.

█ The state court ruling does not collaterally estop Ingalls here on the is-

sue of completion since the date of completion of the project was of no significance and was unnecessary to that decision. The critical matter to be decided there was the date of "acceptance" since the limitary period administered there began running "after such completion *and acceptance* * * * " § 12 (emphasis added). The state court did say in passing that completion occurred on September 29, 1964, but its ruling was that the acceptance occurred on December 28, 1964, 29 A.D.2d at 31, 285 N.Y.S.2d at 371, and the acceptance, not the completion, was the crucial date. See N.Y. Highway Law § 44.

■ This suit is held to be timely brought. The Court finds that actual completion occurred within one year of the commencement of this suit. The significant amount of work done after September 29, 1964 (in absolute terms) was enough to keep the statute of limitations from running prior to October 11, 1964. This result is reached not only under the report by Madigan-Hyland and the various documents introduced by Ingalls that the work was not completed in September, but also under a reading of § 77 itself.

■ Using the defendants' proposed test of substantial completion could easily be employed to bar many trust fund beneficiaries from ever having the right to sue under § 77. For example, in a related litigation, the New York State Court of Claims found that the contract was 99.5% completed by November 1, 1963. Fehlhaber Corp v. State, 63 Misc. 2d 298, 313, 312 N.Y.S.2d 123, 139 (Ct. Cl.1970). There was a complete absence of any work done from November 1963 to July 30, 1964. The .5% represents more than $55,000 of work under this $11-million contract.

The situation might arise in which the final contract work, albeit .5%, could not be or was not completed for more than a year after substantial completion of the contract. In these circumstances, on defendant's view, the beneficiary could no longer enforce trust obligations under

§ 77 because of limitations of time. Furthermore, the beneficial rights under § 77(1) are of a class nature and the result of such a suit binds members of the class. The New York legislature could have written the statute to have beneficiaries sue only in their individual capacities or it could have provided that the statute of limitations runs from the accrual of each beneficiary's claim. But it did not do so and instead opted for only one period of limitations to run from the completion of the work, § 77(2) and to prevent some beneficiaries from being foreclosed from ever maintaining an action under the statute, it must be interpreted to mean that the period of limitations runs from the completion of all work. No counsel has indicated any New York case interpreting § 77(2) to the contrary and this Court cannot find any.

### III. Standing to Sue

Fehlhaber and the Joint Venture next argue in effect that Ingalls has no standing to enforce a statutory trust under Lien Law Article 3–A of which the Joint Venture is trustee. The statute creates a number of separate trusts. The owner of the improvement (here the State) is trustee of all the funds received in connection with the improvement (*e. g.*, proceeds of a building loan mortgage). §§ 70(1), 70(5) Similarly, the contractor is trustee for the funds *he* receives under a contract for a public improvement. §§ 70(1), 70(6)(a). A subcontractor is trustee for a separate trust for the funds *he* receives under the subcontract. §§ 70(1), 70(7)(a).

Fehlhaber and the Joint Venture argue that Ingalls dealt only with Terry at all relevant times in 1960 and 1961, and since Terry was a subcontractor by agreement of the parties to the Joint Venture, Ingalls' Article 3-A rights lie against Terry alone as trustee of funds received under Terry's subcontract with the Joint Venture. This, if correct, would isolate Fehlhaber and the Joint Venture from liability here.

The purchase orders were in Terry's name and Ingalls sent correspondence and invoices (receipted and otherwise) in Terry's name to Terry's (as opposed to the Joint Venture's) office. Ingalls also acknowledged in its April 1962 agreements with Fehlhaber that all prior dealings in respect of the April 1961 agreement had been with Terry alone and that the order for steel had not been taken from Fehlhaber (to be distinguished from the Joint Venture).

█ Nowhere in the statute are the terms *subcontract* and *subcontractor* defined. All that is said is "For the purposes of this section * * * 'contract' and 'subcontract' shall include any modification of the contract or subcontract to which reference is made." § 70(1)(b) The Court finds that Ingalls dealt with the Joint Venture and the parties so intended and understood. Terry was used synonomously with or as a name of the Joint Venture in placing the order for and arranging the purchase of the steel. Ingalls therefore has a claim against the Joint Venture as trustee, for which both Terry and Fehlhaber are liable as the component parts.

The "Pre-bidding and Joint Venture Agreement" in which Fehlhaber and Terry originally created the Joint Venture on January 27, 1960 provided that the parties "shall jointly and severally execute such Contract [with the State]." (clause 6) "The parties * * * constitute[d] themselves as Joint Venturers for the purpose of performing and completing the Contract." (clause 7) "[T]he performance of the work provided for under said contract shall be divided between the parties in accordance with the Schedule annexed hereto." (clause 9) The two parties to the Joint Venture agreed that each should be paid for their respective work by the unit prices on the attached schedule and "[t]he respective items of work to be performed by Fehlhaber and Terry shall be performed *in like effect* as though Fehlhaber or Terry was a subcontractor of the Joint Venture." (clause 10, emphasis added)

It is perfectly clear that the provisions dividing the work between the two joint venturers did that and nothing more. The language that each should act like subcontractors simply emphasizes the manner in which the internal division of costs and therefore profits was to occur. In short, the effect of setting unit prices for which each venturer would be paid was to insure that each have an added incentive to hold its own costs to a minimum since any amount spent by either party above the scheduled cost would reduce its profits in the whole enterprise by the full amount of the excess rather than one-half.

The organization was considerd as one contractor although each of the component companies undertook certain parts of the responsibility within their own organization; they each did their allocated work as a joint venturer and on behalf of the Joint Venture.

The contract with the State was clearly with Fehlhaber and Terry together and it provided that "[t]he contractor shall perform with his own organization work amounting to not less than 50% of the remainder obtained by subtracting from the total original contract value the sum of any items designated in the contract as 'Specialty Items'". (clause VII) The final "Joint Venture Agreement", which superseded the original "Prebidding and Joint Venture Agreement" when it was signed on May 10, 1960 makes no mention of either Terry or Fehlhaber as a subcontractor of the Joint Venture for any purpose.

Ingalls clearly and correctly understood that it was dealing with the Joint Venture in agreeing to supply the structural steel for the Job. The letter of intent of March 17, 1960 identified the Joint Venture as the contractor even though it was signed by Terry. Ingalls' reply was addressed to the Joint Venture. Internal Ingalls' memoranda such as that of August 15, 1960 similarly indicate that Ingalls understood that both venturers were responsible for the functions and performance of the other notwithstanding Terry's name being the only

one on the purchase order; Ingalls' proposal to the Joint Venture was expressly incorporated by reference in the purchase order, overcoming any doubt that the purchase order was with the Joint Venture.

■■ Apportioning the work, paying expenses separately, and being reimbursed from a common pot was not intended by the parties to make and did not make the two firms subcontractors in fact or in law. *E. g.*, Fallone v. Misericordia Hospital, 23 A.D.2d 222, 225, 259 N.Y.S.2d 947, 951 (1965), aff'd without opinion, 17 N.Y.2d 648, 269 N.Y.S.2d 431, 216 N.E.2d 594 (1966). Either venturer could bind the venture if it acted within the scope of its authority to act for the Joint Venture. Fluor Corp. v. United States ex rel. Mosher Steel Co., 405 F.2d 823, 827–828 (9th Cir.), cert. denied, 394 U.S. 1014, 89 S.Ct. 1632, 23 L.Ed.2d 40 (1969); Allen Chase and Company v. White, Weld & Co., 311 F.Supp. 1253, 1258 (S.D.N.Y.1970) (Pollack, J.).

■ The component companies of a joint venture subject to the obligations of Article 3-A of the Lien Law may not assume a subcontract relationship to themselves as venturers in order to or with the effect of negating the trust obligations of the contractor to those supplying materials or services to the project which has been undertaken by the venture entity.

The Joint Venture notified the State of the names of its subcontractors who would be supplying materials or services and accordingly the name of Ingalls Iron Works was submitted as the supplier of steel. The Joint Venture did not name either Terry or Fehlhaber as a subcontractor.

It would be inconsistent for the purposes of the law to protect subcontractors to permit the general contractor to interpose itself as a sub and to allow the general contractor to turn over trust funds to itself as a sub to the detriment of those who have every reason to believe that a trust protects the values supplied by them to the project.

■ In diverting Joint Venture funds to a member of the venture, Fehlhaber and the Joint Venture assumed the risk of their proper application to the uses intended for trust funds.

■ The individual responsibilities which the venturers allocated to each other in connection with the performance of the Job and overseeing that performance do not erode or remove their responsibility to the supplier who as subcontractor supplied items furnished to the Joint Venture project.

Ingalls has standing to enforce the Joint Venture trust and can be granted relief under § 77(3).

### IV. The Legal Effect of the April 24, 1961 Agreement

■ The law is clear that in releasing trust funds to Terry, the Joint Venture, as the contractor, was diverting those funds since Terry was not a subcontractor. §§ 71(2), 72(1).

■ The effect of the April 24, 1961 agreement was a consent to the use by Terry of the funds covered by the agreement, earmarked as they were by trust for Ingalls. The agreement *inter alia* gave Terry approximately six months before payments had to be made,[2] and thereafter the obligation was to be satisfied by installment payments to be made from time to time. Whether Ingalls in-

---

2. Notwithstanding Terry's purported execution of the April 1961 agreement on behalf of the Joint Venture, it is perfectly clear that Terry is the party to the agreement individually and not the Joint Venture. Terry had no actual or implied authority under the Joint Venture Agreement of May 10, 1960 to make such an agreement for the Joint Venture and at least one witness testified that

Ingalls' New York counsel was so aware, cutting off any possibility of Terry's apparent authority. This result is buttressed by Ingalls' demand of a personal guarantee only from Terry's president and not from Fehlhaber's as well as the lack of disclosure of these events to Fehlhaber for almost nine months, apparently upon Ingalls' suggestion.

tended that Terry should use the funds for financing other projects or for delayed payment over to Ingalls is not before the Court. Regardless, any remedy Ingalls has for funds paid to Terry and held back from Ingalls under the April 1961 agreement is against Terry alone and not against the actively defending parties.

 Accordingly, in an accounting under Article 3-A, Ingalls will be credited with having received an amount equal to that paid over to Terry by the Joint Venture prior to November 22, 1961, earmarked for Ingalls' steel supplied to the Gowanus Job.[3]

It is unclear whether the full $1.5-million had been diverted to Terry by November 22, 1961, when Fehlhaber became aware of Terry's misuse of trust funds. Notwithstanding the April 1961 agreement, the actual amount diverted could not be built up thereafter to the full $1.5-million. Following November 22, 1961, it is inappropriate to imply that trust funds were constructively collected by Ingalls from the Joint Venture and loaned to Terry. There was an equitable acceptance by Ingalls of a substitute for the performance of the trust obligations of the Joint Venture to Ingalls only until the Joint Venture was on actual notice that Ingalls now looked to it again.[4]

 The statute requires that trust funds be applied for payment of claims of subcontractors, materialmen, etc. § 71(2) Since Terry was not a beneficiary, §§ 71(2), 71(4), any payment of funds to Terry received in trust by the Joint Venture was a diversion, § 72(1), for which the Joint Venture as trustee was absolutely liable. §§ 72(1), 77(1) The Joint Venture could have paid trust beneficiaries directly. Joint Venture checks, for example, had to have two signatures; they had to be signed by both venturers and steps could have easily been taken to prevent any diversions, as was done on at least one occasion after Fehlhaber learned of the status of the Ingalls account. Had the Joint Venture controlled the funds and kept the books as the law contemplated, they would have prevented Terry's dissipation of trust monies.

Defendants cite numerous cases which, they claim, show that there is an estoppel beyond the amounts referred to above as a credit to the Joint Venture on the Ingalls account. Those cases, however, are inapposite in the instant situation. For example, in General Crushed Stone v. State, 19 N.Y.2d 737, 279 N.Y.S.2d 190, 225 N.E.2d 893 (1967) the ultimate purpose of the scheme, which lasted over several years, was to foist any eventual deficit in payments to suppliers or laborers on sureties on payment bonds. The defendants here have shown no such purpose by Ingalls. The estoppel in Crane Co. v. Park Construction Co., 356 Mass.

---

3. Plaintiff is free to show that money delivered over was specifically requisitioned for uses other than steel purchases, in which case the Joint Venture does not get a credit *pro tanto* on the account due Ingalls. The Joint Venture is not liable, of course, for money that went from Terry directly to bona fide trust beneficiaries pursuant to § 71(2).

4. Defendants offered into evidence a letter from Ingalls' New York counsel to Ingalls of December 7, 1962 in which its activities herein are viewed in a very unfavorable light. Ingalls objected to its admission on the grounds of privilege, claiming that the letter had been produced in October 1969 through inadvertence during pretrial discovery and as a result furnished to defendants without any claim of attorney-client confidence. Defendants countered that the privilege had been waived; that the letter had been made available by defendants' attorneys to Ingalls' attorneys on October 8, 1969 in a deposition proceeding and no timely objection was made nor was there any application between 1969 and 1971 to suppress the document on the ground urged first at the trial. A hearing on the question of inadvertence would be required if the document were to be accorded any significance. However, the Court need not determine the question of privilege belatedly raised since the document has been given no weight herein and is deemed immaterial to the Court's determinations. In these circumstances, the exhibit is deemed stricken as unnecessary for either party's case.

13, 247 N.E.2d 591 (1969) resulted from detrimental reliance by the defendant on the plaintiff's acts. That could not have occurred except perhaps in relation to the money constructively received by Ingalls and loaned to Terry, for which there already is a credit.

### V. March and April 1962 Agreements

 Ingalls now contests the validity of the March and April 1962 arrangements among the parties on several grounds. First, Ingalls claims lack or failure of consideration. But the applicable New York law could not be clearer that obligation modifications and releases need not be for consideration. N. Y. General Obligations Law §§ 5–1103, 15–303, 1–203(27). While Fehlhaber may have breached the contract, there is no failure of consideration under the traditional notions of that doctrine. E. g., Williston, Contracts § 119A (3d ed. 1957); Simpson, Law of Contracts § 158 (2d ed. 1965).

Ingalls next claims that its president did not have authority to execute the documents in question. The fact is otherwise. Not only did he participate in the lengthy negotiations, he conferred thereon with the principal executives of Ingalls including the Chairman of the Board, who had reviewed drafts of the documents and agreed that they should be executed. Attached to the principal document is a sworn statement by Ingalls' secretary certifying that the president had authority "to execute * * * contracts * * * and covenants for and on behalf of Ingalls."

In addition, Ingalls tries to void its agreements on the grounds of duress because defendants were holding back funds which Ingalls badly needed. However, the claim of duress is not established here. The parties negotiated for at least four months. Ingalls' president later characterized the negotiations as "two businessmen trying to solve a problem."

 In the documents in question, Ingalls gave a partial release to Fehl-haber, both individually and as a member of the Joint Venture, from all obligations and liabilities arising out of the furnishing of steel up to and including the $1.5-million referred to in the April 1961 agreement. In context of the documents and the underlying facts, the release applies only to the trust funds turned over to Terry for Ingalls' steel and it does not apply to either trust money held by the Joint Venture for Ingalls (and not turned over to Terry) or trust money turned over to Terry not earmarked for Ingalls. Regardless, expressly excluded from the partial release were Ingalls' rights under Article 3-A with respect to funds received by Terry from the Joint Venture.

 The statutory obligation of the contractor is to hold all monies derived from the Job in trust for the beneficiaries who are protected by Article 3-A. §§ 70(3), 71(2) This means that the Joint Venture could not distribute to its participants any of such monies whether denominated profits or expenses or otherwise until all beneficiaries were paid in full. Consequently, the Joint Venture and Fehlhaber shall account herein for all monies taken by either Terry or Fehlhaber that did not go directly to trust beneficiaries except to the extent Fehlhaber is protected by the partial release.

Executed on the same day as the partial release was an arrangement that indebtedness unpaid to Ingalls described in the April 1961 agreement (and not owed by Fehlhaber or the Joint Venture because of the constructive loan under the April 1961 agreement or the April 1962 partial release) was to be made up pro tanto from Terry's share of the Joint Venture capital and profits. This agreement sets out in detail Ingalls' rights in this regard.

As a pendent matter, Ingalls is entitled to an accounting of its interests under the March-April 1962 agreements and the Joint Venture and Fehlhaber will be directed to render such account as well as the account due under Article 3-A of the Lien Law to Ingalls as explained herein.

## VI. Class Action Claims

Plaintiff's first Count is brought as a class action claim because § 77(1) requires it. Fed.R.Civ.P. Rule 23, *as it existed at the time the suit was brought*, required no more for plaintiff to maintain the action. However, before the pleadings were completed, Rule 23 was amended and present Rule 23 is applicable to this action. See Order Amending Federal Rules, 383 U.S. at 1031, 86 S.Ct. *173*.

Until the eve of trial there was no motion to determine whether this Count could be maintained as a class action as required by Rule 23(c)(1); it further appears that Ingalls could not meet the prerequisites of Rule 23(a).

When the question of class action maintenance arose, the defendants requested a determination that there could be no class action and that other trust beneficiaries be joined. In the alternative, they requested the Court to determine which issues may be subject to class action treatment. Ingalls' position has been consistent on this question. The plaintiff does not care whether this is a class action or not—it just wants its money. The complaint contained class action allegations only because it was thought necessary under § 77(1) of the Lien Law.

On March 26, 1971 plaintiff sent notice to the seven other members of the class and as a result counsel for two appeared on the first day of the trial and stated he knew nothing about the work or the indebtedness to his clients, when it was incurred or when their services were completed. He applied orally to intervene and to have the trial adjourned. His application was denied without prejudice.

■■ Since diversity is the basis of the Court's jurisdiction and the underlying state cause of action has to be a representative action this action must be maintainable as a class action notwithstanding the failure to meet the requirements in Rule 23. Hanna v. Plumer, 380 U.S. 460, 467, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). As a class action, the notice given on March 26, 1971 was adequate and within the Court's discretion under either Fed.R.Civ.P. 23(d)(2) or N.Y.C.P.L.R. § 1005(b).

The other beneficiaries will be permitted to participate in the accounting to the extent described below and therefore there can be no conflict of interest between Ingalls and the other members of the class.

## VII. Express Trust of Joint Venture

The plaintiff's second claim is for breach of an express trust contained in the Joint Venture agreement of May 10, 1960. No protracted discussion of Ingalls' rights, if any, is necessary since Ingalls released them in the April 1962 agreements.

## VIII. Counterclaim

Ingalls waived its rights to assert and covenanted in the April 1962 agreement that it would not file a mechanics lien for the $1,500,000 amount involved in the April 1961 agreement. Yet, it did so in June 1965. Defendants counterclaim for damages resulting from breach of the covenant. Specifically, they claim damages from the unavailability of funds which they say would otherwise have been available to them but for the mechanics lien; from impeded bonding capacity; and from attorneys' fees they were obliged to incur in disputing the lien so improperly filed.

Ingalls moved to dismiss this counterclaim prior to the trial but the motion was denied by Judge Foley without prejudice to its renewal at a later date.

■ Ingalls apparently did breach its covenant but the breach cannot be said to have caused any damage to the defendants. As a condition precedent, the Joint Venture was bound to show that all trust monies had been properly applied and all creditors' claims including those of the plaintiff had been satisfied and consequently that the filing of a mechanics lien had the effect of making funds unavailable to the joint venturers

which otherwise would have been available to them. The facts on this record fail to establish the satisfaction of the condition precedent to a valid claim for damages. The trust obligations to creditors have not been satisfied even to date and the trust funds have never become available for use by the venturers. § 72(1) The attorneys' services, under the circumstances here, cannot be said to have been incurred necessarily since the defendants have not shown that they had an interest in funds which was frustrated. Parenthetically, there was no agreement in the waiver for the payment of attorney's fees in the event of a breach thereof. See e. g., Gordon v. Woods, 202 F.2d 476, 480 (1st Cir. 1953); Ritter v. Ritter, 381 Ill. 549, 46 N.E.2d 41 (1943).

## IX. Conclusions

Accordingly, the plaintiff is entitled to an accounting pursuant to Article 3–A of the New York Lien Law and the defendants Fehlhaber-Terry and Fehlhaber are directed to file an account herein covering all payments from the State of New York to the Joint Venture including those particularly for steel supplied by the plaintiff to the said project, in accordance with the agreed price payable to the plaintiff thereof by the said Joint Venture. The account shall itemize the payments received and key them to the related invoices of the plaintiff. Said defendants shall show the amounts paid on account to plaintiff by the Joint Venture, itemizing the same by dates and amounts and shall credit the Joint Venture with the amounts payable to Ingalls which the Joint Venture turned over to Terry prior to November 22, 1961 and which were part of the constructive loan from Ingalls to Terry under the April 1961 agreement. The accounting shall further show the disposition by the Joint Venture and its members of the balance of the trust funds received and their application to the satisfaction of the claims of trust creditors to the extent that there was such satisfaction. Thus, the account will necessarily reflect unpaid creditors' claims payable out of trust funds received by the Joint Venture.

Said defendants shall file a further account herein of the interests of Terry in the Joint Venture assigned to the plaintiff and the interests of the plaintiff in the agreements of March-April 1962.

Said accounts shall be filed and copies duly served on or before July 15, 1971.

The plaintiff shall have 30 days thereafter within which to file and serve objections to the items of said accounts.

The objections shall be heard before a Special Master or Magistrate to be designated by the Court thereafter, on application of the parties, to hear and report thereon.

Upon ascertainment of the amount due to the plaintiff from the defendants, the other subcontractors of said Joint Venture shall be brought into the suit to determine their unpaid trust interest in any funds shown to exist in the trust account.

The defendants shall be liable jointly and severally as described above for any amount payable by the Joint Venture to the plaintiff and the other subcontractors which the Joint Venture did not apply in pursuance of its trust obligations. To the extent of any funds of the Joint Venture diverted or paid over to Fehlhaber or to Terry in derogation of plaintiff's rights and the rights of other subcontractors, the defendants shall further account therefor to the plaintiff and the subcontractors of the Joint Venture who hold unsatisfied trust claims. An appropriate judgment will be entered following the accountings directed herein.

In the final judgment to be entered herein following the accounting, judgment will run against Terry in favor of Ingalls for the full amount of the indebtedness to Ingalls remaining unpaid for steel delivered, the amount thereof to be established on the accounting. Judgment over will also be entered against Terry on the cross-claim in favor of Fehlhaber and the Joint Venture pur-

suant to Terry's obligations under the Joint Venture Agreement. Fed.R.Civ.P. 55(b).

The counterclaim of the defendants against the plaintiff is dismissed.

The foregoing constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a) and shall constitute an interlocutory judgment herein.

So ordered.