**ALLEN CHASE AND COMPANY,**
**Plaintiff,**

v.

**WHITE, WELD & CO., Defendant.**

**No. 68 Civ. 829 (MP).**

United States District Court,
S. D. New York.

April 17, 1970.

Davis & Cox, New York City, for plaintiff; by Maxwell E. Cox, New York City, of counsel.

Shearman & Sterling, New York City, for defendant; by Charles C. Parlin, Jr., and Thomas F. Fennell, II, New York City, of counsel.

## DECISION AND OPINION

POLLACK, District Judge.

Plaintiff sues to compel defendant to account for a 50 percent share of the fees, commissions or profits received by the defendant in connection with the finding and promoting of an opportunity to acquire and assisting the acquisition by another corporation of the stock of Paddington Corporation. The latter was the exclusive American distributor of Scotch Whiskey and other liquor products under the brand name Justerini & Brooks, Ltd., commonly referred to as J & B.* The plaintiff claims that it entered into an agreement of joint venture with defendant in respect of the above subject matter and reached an understanding to share its fruits equally. The action was tried to the Court without a jury.

This Court has jurisdiction herein by reason of diversity of citizenship and requisite amount in controversy.

At the nub of the plaintiff's case is an alleged oral joint venture agreement. Plaintiff expressly disclaimed on the record any alternative theory of claim on which to recover.

The facts are as follows:

Defendant is a major investment banking firm, carrying on a wide variety of activities in the securities industry. Among such activities are the giving of investment banking advice; management of tender offers; underwriting of publicly offered securities; handling a retail securities business; and finding, advising and assisting others in connection with corporate acquisitions and mergers.

---

* The subject matter herein is referred to interchangeably as "J & B" or "Paddington".

The plaintiff was organized as a California corporation in March 1964 by its principal officer, Mr. Allen Chase, who apparently is also the sole or principal stockholder. He has properly been characterized herein as a "promoter-type" individual. Prior to incorporating and in 1962, Allen Chase was introduced to Harmon L. Remmel, one of the general partners of the defendant. Chase informed Remmel of an opportunity for the acquisition of Signal Oil Company. Chase contends as background for this suit that there was to be a "finder's fee," in the oil company transaction if it eventuated and that an agreement was made to share the prospective fee equally between the defendant and another investment banker, Forest Tanzer of San Francisco. Chase was to be a subparticipant in Tanzer's share. However, no business transaction developed from this opportunity.

Although the issue to be decided in this case does not turn on it, the fact is that the plaintiff from its inception in 1964 was an organization of little corporate substance. It never was much more than an incorporated set of books; it had no income or expenses during 1964, 1965 and 1966, nor did it even have a telephone or an office with a sign on the door. Admittedly, its financial reports showed assets of only a few hundred dollars and liabilities in excess of that amount and a continuous state of insolvency. It did not even have corporate stationery printed until July, 1966 which was well after the transaction that forms the basis of this suit. The business of the plaintiff was then styled on its stationery as "Corporate Finance". Until the filing date of this lawsuit which was in 1968, the plaintiff had never consummated any business transaction, in corporate finance or involving an acquisition or merger.

Some years after their initial meeting and in August, 1965 Chase and Remmel met again. This time Chase told Remmel of the formation of the plaintiff for the purpose of engaging in the business of finding, promoting and advising others in connection with corporate acquisitions and mergers. Chase mentioned that one of his associates, a Mr. McDonald, was a director in some thirty odd corporations, which fact it was hoped would provide some very good opportunities for business deals and that another of his associates was Mr. Ross Corbit, who formerly was president of Hiram Walker, Inc., one of the major companies in the liquor industry and who could expect acquisition opportunities in that industry to be called to his attention. Chase also mentioned some Australian land-owning corporations in which he was interested as good possibilities for investment by defendant's clients.

Remmel agreed to look into such situations as Chase would mention, both parties agreeing that each situation would have to be approached differently. Chase gave Remmel the names of some companies that he thought might be acquisition opportunities. Either in August or at a later meeting in December, 1965, Chase mentioned the availability of Paddington, i. e., J & B, for acquisition. As of December, 1965, it was known within the liquor industry that J & B might be available for acquisition. At that time approximately 40 percent of the stock of Paddington was owned by Star Industries, Inc., a wholesale liquor distributor.

The only things Chase told Remmel about Paddington were the name; that it was a liquor company which sold J & B scotch whiskey; that it might be available for acquisition; and that Ray Revit, a senior officer of Hiram Walker, would furnish information and provide an introduction for Remmel to Paddington.

Through Chase, a meeting was arranged with Revit in mid-December, 1965 for Remmel and James A. Martens, an associate of the defendant, to discuss various liquor situations, including J & B. Revit, on behalf of Hiram Walker, had had negotiations with Abe Rosenberg, the president of Star and with Charles Guttman, the president of Pad-

dington, as to a possible acquisition of J & B by Hiram Walker but these negotiations had terminated shortly before Revit's meeting with Remmel and Martens.

At this mid-December meeting, Revit furnished information to Remmel which he had learned of concerning Star and Paddington and explained that he was furnishing such information only because of his friendship and long association with Corbit. However, Revit failed (he says he refused) to introduce Remmel to the principals in the J & B picture. He considered that such an act would be incompatible with his position at Hiram Walker. After the meeting and during the first part of January, 1966, repeated telephone calls from the defendant to Revit to set up an introduction to principals of liquor companies, were ignored. Revit failed (he says he refused) to respond to these telephone calls from the defendant, plainly evidencing his resolute refusal to assist in furthering any approach of the defendant to J & B's principals or to any others.

At no time did Chase or Corbit introduce or arrange for the introduction of the defendant or any of its representatives to J & B's principals.

Neither plaintiff nor Remmel did anything further with respect to an acquisition of J & B after mid-January, 1966.

As we shall see in a moment, control of Star Industries and Paddington was acquired by Liggett & Myers Tobacco Company (L & M hereafter) in May, 1966 and defendant acted as the investment banker of L & M in the deal. It has been expressly stipulated that the acquisition by L & M did not result directly or indirectly from anything done by Remmel. And it has been expressly further stipulated that the acquisition of control of J & B by L & M did not result directly or indirectly from anything done by plaintiff.

The parties are in agreement as to how the L & M acquisition came about. That history is as follows:

Eli S. Jacobs, at the time an associate, and now a partner of defendant, had been considering an acquisition possibility in the liquor industry (Austin Nichols Co.) since early 1965. Over the Christmas Holidays in 1965, Jacobs was told by Mr. M. M. Goldman, a friend in the liquor business in Fort Worth, Texas, that many companies in the liquor industry, specifically mentioning J & B, were available for acquisition. Beginning in early January, 1966, Jacobs had many discussions with another friend in the liquor industry, Victor Fischel, and again Jacobs was told through this source that J & B was available for acquisition. In February, 1966, Jacobs heard from still another friend in the liquor industry, Herman Merinoff, that J & B was available for acquisition. Finally, at the suggestion of Fischel, who was a close friend of Abe Rosenberg, the head of Star Industries, Jacobs telephoned Rosenberg directly on March 1, 1966 and introduced himself as a mutual friend of Victor Fischel.

Jacobs learned from Rosenberg on March 1, 1966 that J & B was available for acquisition by a company suitable to Rosenberg. Thus, Jacobs had learned independently of the availability of J & B as a possible acquisition from several of his friends in the liquor industry and personally made his own introduction to J & B. Plaintiff did not "find" J & B for Jacobs, did not introduce J & B to him, or interest him in the acquisition of J & B, either directly or indirectly. With the direct information that Rosenberg was interested, Jacobs conceived of the idea of interesting Liggett & Myers in the acquisition of J & B.

During the first week of March, 1966, assisted by others in defendant's organization, an attempt was made to interest L & M in the possibility of acquiring J & B. Jacobs, Todd, Goodwin and Ogden White were the persons who acted for defendant. L & M indicated interest. Remmel had nothing to do with this and didn't even know about it until some weeks later. Plaintiff played no part in the suggestion or selection of L & M as

a company which might be interested in acquiring J & B.

For some years prior to 1966, defendant had been attempting to obtain L & M as one of its investment banking clients. It had made various suggestions to L & M both as to its capital structure and as to possible acquisitions, none of which had been followed by L & M. The J & B prospect thus provided another presentation by the defendant to L & M.

On March 29, 1966, Jacobs met with and told Rosenberg of L & M's interest in J & B and it was Jacobs who on March 30, 1966 at their mutual request brought together Milton Harrington, the president of L & M, and Rosenberg, the president of Star.

After some negotiation, agreements were reached by mid-April, 1966 for L & M to acquire the stock of Rosenberg and certain of his associates in Star, and of Guttman in Paddington, thus giving L & M control of Star and Paddington. In addition, L & M agreed, subject to certain conditions, to make tender offers for the remaining stock of Star and Paddington. These tender offers were made through defendant to the remaining stockholders of Star and Paddington on April 22, 1966. On May 26, 1966 a closing was held at which L & M purchased the Paddington and Star shares covered by the contracts with the insiders as well as the shares tendered pursuant to the tender offers by public stockholders.

In connection with the shares of Paddington and Star purchased by L & M from the insiders, the defendant received finder's fees from L & M totalling $679,166.41. Defendant also obtained fees for managing the tender offer to the public shareholders and certain dealer's fees, totalling an additional sum of $164,689.95. In August, 1966 and May, 1967, defendant realized further fees and profits of $191,927.02 for additional services rendered to L & M on a second tender offer for shares of Star, on a registration and sale of L & M debentures and on a tender offer by Paddington for its own shares.

About two weeks prior to the closing of the L & M acquisition, Remmel phoned Chase to tell him that L & M had asked the defendant to try and acquire J & B. Remmel said that L & M was a regular investment banking client of J & B, but Remmel did not tell Chase that defendant's personnel had suggested the acquisition of J & B to L & M. This phone call seems to have been generated by the fact that the defendant was required to furnish an indemnity to J & B's principals holding them harmless from any claims by anyone for finder's fees. On the basis of what he was told, Chase apparently considered his interest at an end.

In January, 1967, the defendant revived the matter when it offered a fee to plaintiff of $10,000 by reason of a moral obligation it felt it owed to the plaintiff in the J & B matter. The plaintiff wrote back that it did not want the $10,000 unless it had been earned. But, plaintiff added, by the same token if it had played any part in an acquisition and merger, it would like to be paid a fee commensurate with its contribution, be it $1 or $1,000,000. The plaintiff did not then (in January, 1967) make any claim that it was a co-adventurer of the defendant or entitled as a partner of the defendant to a one-half share of the fees and commissions earned.

Apparently, plaintiff consulted counsel thereafter who communicated with defendant. When the nature of the communication came to his attention, Chase, in a letter to defendant dated October 5, 1967 explained that he had asked legal advice concerning his belief that "we perform (sic) substantial services as well as being the 'finder' in this merger"—but again no mention by plaintiff of any joint venture or partnership.

Until this suit was brought, plaintiff requested from defendant only "a fee commensurate with our contribution". There never was any writing signed by

or on behalf of defendant stating any agreement for or relating to compensation for plaintiff on an acquisition of J & B.

Defendant has not paid plaintiff anything.

The plaintiff endeavored to construct a financial obligation owing to it under the allegations of the complaint by testimony of Chase that at his meeting with Remmel in August or September, 1965, he had told Remmel that the parties would work on the same basis as they had agreed to for the 1962 Signal Oil matter; namely, 50 percent of the commissions for White Weld and 50 percent for Allen Chase & Co. This, he said, "was specifically agreed to" when Remmel allegedly told Chase "that is satisfactory". Chase also said that the plaintiff would work with Remmel on an exclusive basis for New York situations. None of these statements was ever reduced to writing or corroborated by anyone.

Chase testified further that early in December, 1965, on the occasion when Chase told Remmel that J & B was available and that Ray Revit would make the introduction to the proper people at Paddington, he "again reiterated the fee situation", "that we would be working on our usual basis of fifty-fifty", to which Remmel is said to have again replied that this was satisfactory.

Chase claimed—on the trial—yet a third such conversation. In the latter part of January, 1966, there was a meeting which Chase and Remmel attended concerning the Australian properties and afterwards in the hallway, Chase says that he and Remmel spoke of J & B and of Revit's refusal to make an introduction to J & B. Chase testified that he recalled telling Remmel that he felt sure that he could get Corbit to make the introduction if Remmel had an actual client who was interested. He further testified that he again reiterated, in the hall, "that we were working on the usual basis of fifty-fifty" and that Remmel acknowledged this. In fact, there had never been any transactions —usual or otherwise—in which such an arrangement had been effected. By way of contrast to his trial recollection, before the trial, Chase had testified that he did not remember any such conversation having taken place in January, 1966. He testified then "I am sorry, I don't have a specific remembrance of having discussed it [J & B] with him during my January 20 visit", and he added that he didn't know what would refresh his recollection.

Remmel contradicted the testimony of Chase and testified that there never was any understanding or agreement between Chase or the plaintiff and the defendant concerning fees or compensation relating to a possible acquisition of J & B or any other company; there never was any sharing arrangement made either in 1962 or in 1965.

The words "joint venture" never appeared in any writing sent by either party to the other and were never used in their discussions and never even appeared in any file memorandum made by Chase; he had never prepared a memorandum for himself on this important subject which discussed any fee arrangement with Remmel.

Plaintiff is suing to recover from defendant as a joint venturer. He made no claims herein for any services possibly performed as a finder.

■ If, indeed, there were an agreement of joint venture between the parties, it would be irrelevant on the issue of liability to plaintiff whether defendant was represented by Harmon L. Remmel or by Ogden White or Jacobs (all partners of defendant) in approaching L & M to ascertain its interest in acquiring J & B; all were acting in furtherance of the business of the partnership. The knowledge of one partner and the agreement of the firm made by one partner would bind the partnership.

■■ Proof of an actual oral agreement of joint venture is sufficient to establish such a relationship. But if the plaintiff's relation to defendant was merely that of a finder, even if there

had been a causal relationship between the services rendered and the ultimate transaction, the plaintiff would be barred from recovery by the Statute of Frauds [New York General Obligations Law, McKinney's Consol.Laws, c. 24–A, 5–701(10)].

■ This legal distinction for many years has caused parties desiring to enforce oral contracts in respect of business opportunities to endeavor to spell out joint ventures or partnerships in order to escape the bar of the Statute of Frauds. The evidence in litigations of this kind must be scrutinized carefully in order to determine whether the facts warrant a conclusion that a joint venture or partnership was formed. *Cf.* Weisner v. Benenson, 275 App.Div. 324, 325, 89 N.Y.S.2d 331 (1st Dept.1949), aff'd, 300 N.Y. 669, 91 N.E.2d 325 (1950). The burden is on the plaintiff to establish an agreement to form a joint venture.

■ The testimony given to establish a joint venture agreement is lacking in probity and weight and the circumstances are clearly against the probability of its existence. It would tax credulity beyond the breaking point to find that a joint venture agreement was discussed or made here. The demeanor evidence, the testimony, the documents, the circumstances and the probabilities, duly considered and weighed, make it clear that no agreement express or implied for a joint venture was discussed or made by the parties.

It is clear that the understanding of the parties was that plaintiff was to contribute no more than the ordinary business broker or finder. The only participation expected of plaintiff was the finding and furnishing leads to the deal.

As to the services plaintiff claims to have in fact rendered, plaintiff points to only the usual services of a business finder or broker minus the introduction to the party involved.

Moreover, even accepting plaintiff's version of the oral understanding, the elements of a joint venture are lacking, in several major respects:

(a) There was to be and there was no joinder of property, skills or risks or commingling of the properties and interests of the alleged joint venturers;

(b) There was to be and there was no mutual right to control the carrying out of the alleged joint venture;

(c) There was no discussion or agreement on the scope or duration or other requisite terms of the alleged joint venture agreement.

Inconsistently with the notions of a joint venture and of a trust res, Chase felt free to and did on his own behalf present the J & B opportunity to American Home Products for acquisition by it without telling the defendant about this.

Plaintiff contends that no losses reasonably could be anticipated here due to the nature of the joint venture claimed. Thus, plaintiff says that it is unnecessary to decide whether the agreement to share in the rewards carried with it a concommitant burden to share in the losses. Moreover, it has been held that it is not indispensably essential to the existence of a joint venture that there be an agreement to share losses. Mariani v. Summers, 3 Misc.2d 534, 52 N.Y. S.2d 750, 754 (Sup.Ct.1944), aff'd, 269 App.Div. 840, 56 N.Y.S.2d 537 (1st Dept.1945).

■ But again, even disregarding the defendant's evidence, the plaintiff has failed to establish any basis for finding a partnership agreement. A person who has no proprietary interest in the business save to share profits as a compensation for services is not a partner or joint venturer. An agreement made in exchange for a business finder's or a broker's services performed at plaintiff's pleasure, to compensate plaintiff in an amount measured by the net profits realized on a deal found by the plaintiff does not create a joint venture. *Cf.* Matter of Steinbeck v. Gerosa, 4 N.Y.2d 302, 317–318, 175 N.Y.S.2d 1, 151 N.E.2d 170 (1958); Mitler v. Frie-

deberg, 32 Misc.2d 78, 222 N.Y.S.2d 480 (Sup.Ct.1961).

As stated in Cassidy v. Hall, 97 N.Y. 159 at 168 (1884):

" * * * it is well settled that when a party is only interested in the profits of a business as a means of compensation for services rendered, as was the fact under the contract in the case at bar, or for money advanced, he is not a partner."

■ Perhaps, the most important criterion of a joint venture is the joint control or management of the joint property used in accomplishing its aims. Detachable Bit Co. v. Timken Roller Bearing Co., 133 F.2d 632, 635 (6th Cir. 1943). There is no evidence of such an arrangement in the case at bar.

The $10,000 offer which the defendant made in satisfaction of what it deemed to be its moral obligation was one which the defendant was not legally obligated to make because the plaintiff did not have a legally sufficient writing to require payment of compensation to him for his part in the matter. Moreover, it was questionable whether plaintiff performed fully as a finder.

The final deal which was carried through with J & B did not flow directly or indirectly from plaintiff's introduction of the matter to the defendant; it did not essentially result directly or indirectly from plaintiff's act in bringing the business to defendant. No connection is traceable between plaintiff's introduction of the business possibility and the termination of the transaction. Cf. Seckendorff v. Halsey, Stuart & Co., Inc., 234 App.Div. 61, 70–71, 254 N.Y.S. 250 (1st Dept. 1931), rev'd on other grounds, 259 N.Y. 353, 357, 182 N.E. 14 (1932); Ames v. Ideal Cement Co., 37 Misc.2d 883, 885–86, 235 N.Y.S.2d 622 (Sup.Ct.1962); Simon v.

Electrospace Corp., 32 App.Div.2d 62, 299 N.Y.S.2d 712 (1st Dept.1969).

■ In any event, the waiver of a writing in connection with the $10,000 offer did not change the plaintiff's status to that of a partner-joint-venturer of the defendant. The business motivation for the defendant's offer of payment did not supply a partnership agreement where none existed before and is no wise probative of the existence of a partnership.

■ Similarly, the fact that defendant failed frankly to reveal to plaintiff its role in the J & B acquisition and its diffidence in failing to disclose its profits therefrom are unfortunate but again go only to the non-disclosure of matters bearing on the value of an introduction (were that the issue) and do not establish circumstantially the existence of a joint venture.

In conclusion, there is more reason to believe that the parties expected to agree at the end on what in fact should prove to be just remuneration for what plaintiff had done, than that there was any agreement whereby plaintiff was to have some ownership in the fee itself. In short, plaintiff failed to establish its claim of a joint venture by a preponderance of the credible evidence.

■ It was expressly stipulated and the Court finds that there was no fraud or overreaching in the conduct of the defendant or of any of its partners or associates in respect of the J & B matter.

The plaintiff, on the record, has expressly disavowed any claim herein by it for a finder's fee for providing a lead on the J & B matter; or on the theory of *quantum meruit* for services rendered to the defendant.

Complaint dismissed, with costs.

So ordered.