James C. THOMAS, Individually & As Trustee of SLT Trust #1

v.

E. Lawrence PRICE, Individually & as Trustee of the Elaine Price Trust 1983, Newcomb Securities Company, Inc., a Delaware Corporation, Newcomb Securities Company, a New York Limited Partnership, Gila Rosenhaus Wienner, Jerome Cossman, Peter F. Jacoby, Earl R. Price, L. Proctor Thomas, Baker & Botts, a Texas General Partnership, and Church & Thomas Bank (Unincorporated), a Texas General Partnership.

Civ. A. No. G–86–183.

United States District Court, S.D. Texas, Galveston Division.

June 14, 1989.

Kevin E. Glynn and Bernard M. Jung, Kansas City, Mo., for plaintiff.

Rufus Wallingford and A. Frank Koury, Fulbright & Jaworski, Houston, Tex., and William I. Goldberg, Holleb & Coff, Chicago, Ill., for defendant E. Lawrence Price.

## MEMORANDUM OPINION & ORDER

### HUGH GIBSON, District Judge.

This case was filed on May 9, 1986, and has floundered ever since on the docket of this Court. The parties are interminably mired in an acrimonious confrontation that involves issues of first impression in Texas jurisprudence. In an attempt to refocus this litigation, the Court ordered the parties to rebrief the Price defendants' second motion for summary judgment. The Court also had the parties brief some additional matters. The Court has reviewed the briefs of the parties and will now apply its interpretation of Texas law to the facts so that this entire case can be put into perspective and this litigation concluded.

### I. FACTS [1]

Plaintiff James C. Thomas is the trustee of the SLT Trust. Defendant Earl Lawrence Price is the trustee of the Elaine Price Trust (Price I). Defendant Earl Raymond Price is the father of Lawrence Price and the trustee of a second trust for Elaine Price (Price II). In November 1983, the SLT Trust and Price I entered into a fifty-fifty partnership to purchase one of Texas' few remaining private banks.[2]

At the time of the formation of the bank partnership, each partner made an initial capital contribution of $100,000.[3] Additional capital contributions were funded by loan proceeds.[4] In this regard each trust borrowed $750,000 from Newcomb Securities (Newcomb).[5] The loans were nonrecourse, secured, and repayable with interest on or before November 7, 1985.[6] The

---

1. This case had its judicial origins in the State of New York. The findings of fact and conclusions of law issued in the New York proceeding provide an excellent recitation of the factual history of this case. See *Thomas v. Price*, 631 F.Supp. 114 (S.D.N.Y.1986).

2. *Thomas v. Price*, 631 F.Supp. 114, 114–15 (S.D.N.Y.1986).

3. Plaintiff's Application for Temporary Restraining Order and Injunctive Relief at 3 (August 29, 1986) [hereinafter Plaintiff's Application for TRO].

4. *Id.*

5. *Thomas*, 631 F.Supp. at 115. Newcomb is a New York Securities Dealer owned by the family of Lawrence Price. Lawrence Price is the managing and general partner. *Thomas*, 631 F.Supp. at 115; Plaintiff's Application for TRO at 3.

6. *Thomas*, 631 F.Supp. at 115.

SLT–Newcomb security agreement granted Newcomb a security interest in SLT's "right, title, and interest in its interest in the Partnership, as such interest is defined by Section 26 of the Uniform Partnership Act of the State of Texas."[7] Newcomb also had a security interest in whatever proceeds SLT received from its interest in the partnership.[8] More importantly, the security agreement provided that Newcomb would "have no right to interfere in the management, administration, affairs, or control of the Partnership," in the absence of an event of default.[9]

Thereafter, the partnership acquired the bank. Pursuant to the partnership agreement, "a four-person Management Committee was appointed to manage the bank."[10] SLT appointed James Thomas and Bernard Gram. Price I appointed Lawrence Price and Peter Jacoby.[11] The management committee then entered into separate management contracts with Thomas and Lawrence Price. Thomas became the bank's general manager. Lawrence Price became its chairman.[12]

From the partnership's inception, Thomas and Lawrence Price had numerous disagreements over how the bank should be run. This conflict apparently caused Newcomb to suspect that SLT would default on its loan obligations when they came due. On November 5, 1985, and in anticipation of SLT's default, Newcomb assigned the nonrecourse note and its security agreement to Price II.[13] As consideration for the assignment, Newcomb received a full recourse promissory note for $750,000. The note's new due date was November 7, 1986.[14]

On November 7, SLT's nonrecourse note came due. SLT did not make any payments to either Newcomb or its assignee, Price II.[15] On November 8, Raymond Price, in his capacity as trustee for Price II, advised Thomas of Newcomb's assignment and that payment was due within ten days.[16] When no payment was made by November 18, a default occurred. Price II took constructive possession of the collateral by its letter of November 26.[17] The letter notified SLT of Price II's intention to retain the collateral in full satisfaction of SLT's obligations under the nonrecourse note, unless Price II received written objection within twenty-one days of November 26 (December 17, 1985).[18] If an objection was filed, then Price II would sell the collateral at a private or public sale as autho-

7. SLT–Newcomb Security Agreement § 1.

8. *Id.*

9. *Id.* An event of default included SLT's failure to pay the nonrecourse note when due, provided that such failure continued for ten days after written notice of default. *Id.* at § 4.1(a).

10. *Thomas,* 631 F.Supp. at 115.

11. *Id.*

12. *Id.*

13. *Id.* at 115–16.

14. *Id.* at 116 and 118. There is a minor discrepancy in the New York court's findings of fact. Finding number six refers to a 1985 due date. Finding number twenty refers to a 1986 due date. This Court presumes that the 1985 date in finding number six was a typographical error, and that the correct date is the 1986 date in finding number twenty.

15. *Id.* at 116. Thomas alleged in the New York proceedings that the reason he refused to pay the nonrecourse note was because the various Price interests failed to honor two agreements that would have indemnified Thomas Construction Co. for $750,000. These agreements were referred to by the parties as the Stanhope transaction. *Id.* at 116 n. 2. Thomas' position was that the indemnification agreements were quid pro quo for the money Newcomb loaned the SLT Trust. *Id.*
Since the Stanhope agreements were never mentioned in the partnership or security agreements, the New York district court expressly found the Stanhope transaction to be irrelevant. *Id.* Accordingly, the New York court refused to allow the Stanhope agreements to alter the terms of the partnership and security agreements. *See id.*

16. *Id.* at 116.

17. Price II's possession was constructive because the secured interests were essentially intangible. The interest in profits and surplus and management could not be seized in the same sense that a secured party seizes a car or a heavy piece of equipment.

18. *Id.*

rized by section 9–505(b) of the Texas Business and Commerce Code.[19]

By letter dated December 11, 1985, Thomas' attorney notified Price II that it objected to disposal of the collateral under section 9–505(b). Instead, Thomas' attorney insisted that disposition be made under section 9–504.[20] Thomas' attorney also requested that Thomas' Trustee receive notice of any public or private sale.[21]

By letter dated December 20, Price II notified SLT that a private sale of the collateral would be held on or after January 8, 1986. SLT was also advised that in order to preserve the collateral, Raymond Price and Elaine Price had been appointed to replace Thomas and Bernard Gram on the bank's management committee. Furthermore, the committee appointed Lawrence Price as managing partner and general partner of the bank.[22] On December 30, Thomas formally objected to the removal of he and Gram from the management committee.[23]

By letter dated January 2, 1986, an attorney for the Price interests advised Thomas that the private sale of the collateral was being delayed until or after January 14, 1986. Thomas was further advised that the sale would be abandoned if by the close of business on January 7, Thomas made Price II an offer to purchase SLT's interest in the partnership. The letter also stated that Price II would decide within 48 hours of receiving the offer whether to sell the partnership interest to Thomas or purchase the interest on those same terms, less the principal and interest already due and owing under the nonrecourse note.[24]

On January 6, the attorneys for the parties held a meeting. Thomas' attorney stated that Thomas refused to buy SLT's nonrecourse note. Moreover, Thomas' attorney insisted that Lawrence Price honor the indemnification agreements concerning the Stanhope transaction.[25] On January 7, Thomas' attorney objected to the Enterprise transaction[26] and the commercial rea-

---

**19.** *Id.* TEX.BUS. & COM.CODE ANN. § 9.505(b) provides:

> In any ... case ... involving collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor.... If the secured party receives objection in writing ... within twenty-one days after the notice was sent, the secured party must dispose of the collateral under Section 9–504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.

**20.** *Thomas,* 631 F.Supp. at 116. TEX.BUS. & COM.CODE ANN. § 9.504 provides:

> (a) A secured party may sell ... or otherwise dispose of any or all of the collateral....
> (c) Disposition of the collateral may be by public or private proceedings.... Sale or other disposition ... including the method, manner, time, place and terms must be commercially reasonable.... [R]easonable notification of the time and place of any public sale or ... of the time after which any private sale ... is to be made shall be sent ... to the debtor.... The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market ... he may buy at private sale.
> (d) When collateral is disposed of ... the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made

and and [sic] security interest or lien subordinate thereto....

**21.** *Thomas,* 631 F.Supp. at 116.

**22.** *Id.* at 117.

**23.** *Id.*

**24.** *Id.*

**25.** *Id.* See *supra* note 15.

**26.** According to Thomas, the Enterprise transaction was a $1.5 million dollar unsecured loan to Enterprise Partners, a limited partnership owned by Lawrence Price. Plaintiff's Second Amended Complaint at 9 (July 21, 1987). Thomas complains that on December 31, 1985, the bank accepted a $1.5 million dollar deposit from Newcomb Securities, then simultaneously loaned the $1.5 million to the Enterprise Partners. Plaintiff Second Amended Complaint at 9; *see also,* Plaintiff's Application for TRO at 5–6. The money was then transferred to Brittenum & Associates, Inc., an Arkansas securities firm on the brink of bankruptcy. Plaintiff's TRO Application at 6. The Enterprise Partners used the loan to pay 7–days interest on a $1.038 billion dollar loan designed to generate $2.65 million in fraudulent tax losses and deductions to the Enterprise Partners. Plaintiff's Second Amended Complaint at 10. Brittenum repaid the loan on January 2. The bank then wire

sonableness of any private sale of the collateral to either Lawrence Price or a Price affiliate.[27]

On January 8, Prices' attorney defended the Enterprise transaction by pointing out that the loan had been repaid in full. Prices' attorney also stated that the "private sale of the SLT's Partnership interest would be conducted in a manner that would assure its commercial reasonableness," and that the previous notice to SLT of the forthcoming sale was entirely sufficient.[28] On January 9, Prices' attorney advised Thomas' attorney that prior to any sale of the collateral, SLT would be given an opportunity to purchase the collateral on "substantially the same terms as those provided in the proposed sale." [29]

On January 17, 1986, Prices' attorney advised SLT that the private sale would take place on January 28. Furthermore, SLT was advised that it could retain its partnership interest by paying all the interest owing on the nonrecourse note and by converting the overdue nonrecourse note into a full recourse note that would be due and owing on November 7, 1986.[30] On January 22, SLT responded by saying that if any purchaser of the collateral attempted to interfere with Thomas' management interests in the bank, he would "take all steps necessary to protect the interests of both the Bank and the SLT Trust." [31]

On January 23, Thomas, individually and as trustee of the SLT Trust, filed suit in a New York state court seeking a temporary restraining order against the defendants to prevent their assumption of Thomas' management rights and to prevent the sale of the collateral. The TRO was issued. Its expiration date was February 6. On February 5, the defendants removed the action to the United State District Court for the Southern District of New York.[32] An evidentiary hearing was conducted on February 18, 19, and 20. The New York district court issued its findings of fact and conclusions of law on March 6, 1986. The court denied Thomas' application for declaratory and injunctive relief.[33] Thereafter, Thomas appealed.

On May 9, 1986, and while their appeal was pending at the Second Circuit, the plaintiffs filed the present action seeking dissolution of the partnership. The appeal was dismissed by the consent of the parties on May 30, 1986.[34] At that point, Price II had an opportunity to consummate the sale of the collateral. For reasons unknown, the sale never occurred. Thereafter, on August 29, 1986, the plaintiffs moved this Court to issue a temporary restraining order to prevent the sale of the collateral. The Court denied the motion, but stayed its effective date until 12:00 noon, September 10. On September 10, after the stay expired, Price II sold the collateral to the Lawrence Price Trust (Price III).[35] Neither Thomas nor SLT bid at the sale.[36] The sale cutoff the SLT Trust's right to redeem the

transferred the $1.5 million back to Newcomb Securities. Plaintiff's TRO Application at 6.
SLT feels that these secret transactions constituted fraudulent self-dealing by the defendants, and exposed it to enormous liability to the Trustee in Bankruptcy and creditors of Brittenum. *Id.* In addition, SLT still considers itself a 50% partner and feels that the value of its partnership interest has been severely damaged.

27. *Thomas,* 631 F.Supp. at 117–18.

28. *Id.* at 118.

29. *Id.*

30. *Id.*

31. *Id.*

32. *Id.* at 118–19.

33. *Id.* at 126. The New York court did not decide whether SLT remained a partner in the bank. *Id.* Also left unresolved were the issues of whether SLT would be liable to third parties and if the loss of management rights forced a dissolution under Texas law. *Id.*

34. Price Defendants' Memorandum in Support of Motion for Summary Judgment at 2 (January 9, 1989).

35. Price Defendants' Motion for Summary Judgment on Counts I–V and IX of the Second Amended Complaint, Exhibit 2 at 6 (August 18, 1987).

36. Price Defendants' Memorandum in Support of Motion for Summary Judgment at 4–5 (January 9, 1989).

collateral.[37]

Over the next twenty-five months, the case followed a tortuous path. The plaintiff doggedly persisted in trying to discover every document that could possibly be associated with the case. The end result was to delay disposition. In an effort to reassert some control over the direction of the case, the Court thought it important that certain legal issues be addressed before allowing the plaintiffs to further muddy the turbid waters of this litigation. Accordingly, on November 14, 1988, the Court ordered the parties to do some additional briefing. Shortly thereafter the plaintiffs moved to recuse the Court and the magistrate. The magistrate was formally recused on November 23. On January 3, 1989, the Court issued an order refusing to recuse itself.[38]

After reviewing the briefs that were the subject of the Court's November 1988 order, the Court found the parties' responses to be inadequate. Before the Court could conclude its own research on the matter, the plaintiffs filed a petition to the Fifth Circuit to mandamus the Court to recuse itself. By order of the Fifth Circuit, all proceedings in this Court were stayed pending the Fifth Circuit's ruling on the petition for mandamus. On May 15, 1989, the Fifth Circuit denied the plaintiff's petition for recusal and the stay was lifted. Undaunted by the setback, the plaintiffs filed a petition for rehearing *en banc*. Since there is no pending order by the Fifth Circuit staying the proceedings of this Court, this Court is free to enter this Memorandum Opinion & Order, which addresses the plaintiffs' standing to assert the causes of action alleged in their second amended complaint.

Although the second amended complaint is less than a paragon of clarity, it appears to assert the following nine causes of action:

1. A decree for a dissolution and accounting because the defendants' conduct has so prejudicially affected the partnership's business that it is not reasonably practicable to carry on the business as partners.

2. The bank, SLT Trust, and Thomas were wrongfully exposed to liability to the Bankruptcy Trustee and creditors of Brittenum & Associates as a result of the tax fraud perpetrated in the Enterprise transaction.[39]

In addition, this claim asserted two breaches of the partnership agreement. First, the defendants failed to indemnify Thomas Construction Company. Second, the defendants refused to pay legal and accounting fees due and owing to third parties who provided professional services to the bank.

3. Breach of the SLT–Newcomb security agreement by wrongfully seizing control of the collateral and damaging the collateral by using it as an instrumentality to perpetuate tax and bankruptcy fraud.

4. Civil conspiracy to misapply partnership property and funds.

5. Violation of the Racketeer Influenced and Corrupt Organizations Act,[40] by conducting and participating in an interstate enterprise through a pattern of racketeering activity and making a series of fraudulent transfers through the bank to commit tax fraud.

6. Intentional interference with the bank's operations by the law firm of Baker & Botts and L.P. Thomas, a partner with Baker & Botts.

---

**37.** TEX.BUS. & COM.CODE ANN. § 9.506 provides:

At any time before the secured party has disposed of collateral ... under Section 9.504 (*supra* note 20) or ... Section 9.505(b) (*supra* note 19) the debtor ... may ... redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as reasonable expenses incurred....

**38.** The Court found the plaintiffs recusal motion to be unsupported and highly tenuous. January 3, 1989 order at 17. Furthermore, it appeared that the motion was a dilatory litigation tactic. Neither the plaintiffs nor their attorneys seemed interested in a resolution of the lawsuit as originally filed. *Id.* at 16.

**39.** See *supra* note 26.

**40.** 18 U.S.C. §§ 1961–68.

7. Negligent representation by the law firm of Baker & Botts and L.P. Thomas.[41]

8. Breach of the management agreement to pay Thomas his management fee.

9. An improper call was made upon SLT for a further capital contribution.

## II. PLAINTIFF'S STANDING TO BRING THESE CLAIMS

In order to determine whether the plaintiffs have standing to assert one or more of the above causes of action, this Court must expressly decide those issues which the New York district declined to decide. More specifically, is the SLT Trust still a partner in the bank in light of the fact that it lost its interest in the profits and surplus and its management rights to Price II?[42] Does SLT's loss of management rights force a dissolution of the partnership?[43] What liability, if any, does SLT have to third parties for actions taken by the bank after SLT lost its management rights?[44] In other words, what are the consequences to a partner and the partnership when that partner loses its interest in the profits and surplus and its management rights? These issues are of first impression in Texas jurisprudence[45] and

their resolution turns upon the partnership agreement of the parties and the Texas Uniform Partnership Act.[46] Only where the partnership agreement is silent "do the provisions of the Texas Uniform Partnership Act ... come into play."[47] If the statute is silent, then this *Erie* court would look to the case law of the Texas courts.[48] In the absence of Texas case law, the Court would do as Texas courts would do and seek its guidance by looking to the partnership law of other jurisdictions.[49]

### A. *The SLT Trust's Partnership Status*

In order to determine whether SLT's loss of its profits and surplus and its management rights caused it to cease to be a partner, the Court must look at what constitutes a partnership. Under Texas partnership law, a partnership "is an association of two or more persons to carry on as co-owners a business for profit."[50] Major incidents of the partnership relationship are an agreement among the participants to share profits and losses and a mutual right of control to manage the partnership.[51] Although the sharing of profits and losses is prima facie evidence of a partnership,[52] the issue of control is the more important criterion in determining the ex-

41. The causes of action enumerated as numbers six and seven were only against Baker & Botts and L.P. Thomas. The Price defendants' were not implicated. The Court granted summary judgment in favor of Baker & Botts and L.P. Thomas on December 18, 1987.

42. *Thomas,* 631 F.Supp. at 126.

43. *Id.*

44. *Id.*

45. The Court's research indicates that these issues would be of first impression in every jurisdiction.

46. "The Texas Uniform Partnership Act was derived from the [1914] Uniform Partnership Act," TEX.REV.CIV.STAT.ANN. art. 6132b, § 1, Source and Comments (Vernon 1970), and has been adopted by forty-nine of the fifty states. *Id.* at Table of Jurisdictions Wherein Act Has Been Adopted (Vernon Supp.1989). Louisiana is the sole exception. *Id.* The Texas Act was

adopted in 1961. *Id.* (Vernon 1970). Its effective date was January 1, 1962. *Id.*
Despite some initial modifications to the Uniform Act prior to its adoption, the Texas Act has remained relatively unchanged over the past 27 years. The only apparent changes were the addition of § 6–A in 1979 and a modification to § 32 in 1985. *See* art. 6132b (Vernon Supp. 1989).

47. *Park Cities Corp. v. Byrd,* 534 S.W.2d 668, 672 (Tex.1976).

48. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

49. *See Nichols v. Anderson,* 837 F.2d 1372, 1375 (5th Cir.1988).

50. TEX.REV.CIV.STAT.ANN. art. 6132b, § 6 (Vernon 1970) [hereinafter art. 6132b].

51. *See Box v. Associates Inv. Co.,* 389 S.W.2d 687, 690–91 (Tex.Civ.App.—Dallas 1965, no writ).

52. Art 6132b, § 7(4).

istence of a partnership.[53] The idea is that management authority is such a substantial right that it is inconsistent to say one is a partner or co-owner if he, she, or it has no authority to exercise that right.[54]

■ Interestingly, the very factors that are significant in determining partnership formation also constitute two of the three property rights of every partner. Thus, every partner has a property right to share in the profits and losses of the business and to participate in the management of the business.[55] The final property right is a partner's interest in specific partnership property.[56] Of the three property rights, the first two are assignable, while the third is generally not.[57]

■ In the case *sub judice*, the partnership agreement provided that each partner had the right to grant a security interest in their share of the profits and surplus of the business.[58] Yet, the agreement also provided that such a grant would not "dissolve the partnership nor in any way affect or diminish each partner's continuing right to management and control of the partnership nor entitle the secured party to interfere in the management or administration of the partnership business or affairs." [59]

At first glance, it would appear that SLT still has management rights and Price II has none. Yet, the SLT–Newcomb Security Agreement provided that SLT would lose its management rights if there was an event of default.[60] As the New York court correctly pointed out, neither the partnership agreement nor the Texas U.P.A. prohibit the assignment of a partner's interest in the profits and surplus along with an assignment of that partner's management rights.[61] Moreover, the mere making of such a grant did not confer the secured party with management rights.[62] The subsequent acquisition of management rights, however, was limited to SLT's interest in those rights and could only occur in the event of default.[63] The secured party's right to exercise its management rights is an entirely different matter. It is this issue upon which this Court and the New York court disagree. In other words, did Price II, as Newcomb's successor, have the right to immediately exercise the management rights that SLT lost?

■ The New York court stated that such an interpretation was necessary in order to give effect to the assignee's assumption of SLT's management rights.[64] If true, then Price II's immediate right to

**53.** *Allen Chase & Co. v. White, Weld & Co.,* 311 F.Supp. 1253, 1260 (S.D.N.Y.1970). Though the New York court was looking at the issue of control in the context of a joint venture, *id.* at 1260, a joint venture is in the nature of a partnership and is governed by the rules of partnership. *Fry v. Shaw,* 508 S.W.2d 142, 145 (Tex. Civ.App.—Dallas 1974, writ ref'd n.r.e.).

**54.** *See Chariton Feed & Grain v. Harder,* 369 N.W.2d 777, 785, 789 (Iowa 1985); *Myrland v. Myrland,* 19 Ariz.App. 498, 508 P.2d 757, 761–62 (1973); *Allen Chase,* 311 F.Supp. at 1260; *Spier v. Lang,* 4 Cal.2d 711, 53 P.2d 138, 140 (1935); *Greene v. Brooks,* 235 Cal.App.2d 161, 45 Cal. Rptr. 99, 102 (1965).

**55.** Art. 6132b, § 24.

**56.** *Id.* Section 25(1) provides that the partners hold the property as tenants in partnership. Accordingly, this would suggest that the property is owned by the individual partners. Section 25(2), however, imposes several restrictions on the tenancy relationship. Functionally, the end result is that partnership property is owned by the partnership. *See Miller v. Howell,* 234

S.W.2d 925, 929–30 (Tex.Civ.App.—Fort Worth 1950, no writ).

**57.** *See* art. 6132b, § 27(1) (assignment only entitles the assignee to receive the profits that the assigning partner would otherwise be entitled, and, in the absence of an agreement, there is no right to participate in the management of the partnership) (the right to assign an interest in partnership property is omitted); *see also* art. 6132b, § 25(2)(b) (a partner's right in specific partnership property is not assignable except in connection with the assignment of rights of all the partners in the same property).

**58.** Partnership Agreement § 17(c).

**59.** *Id.*

**60.** SLT–Newcomb Security Agreement § 1.

**61.** *Thomas,* 631 F.Supp. at 124.

**62.** *Id.*

**63.** *Id.*

**64.** *Id.* at 124–25.

participate in the management of the bank, coupled with its interest in the profits and surplus, made Price II a partner in the bank with Price I.[65] While it is obvious that Price I would not object to such a result on these facts, it is fair to say that Price I would not want to be forced into such a partnership relationship if the lender had been a different entity with whom Price I had some objection. Thus, the New York court's conclusion of law runs contrary to the doctrine of delectus personarum—that partners are free to choose their associates.[66]

The better analysis is that SLT had the right to assign its management rights. Upon default, Price II acquired SLT's interests in the profits and surplus of the partnership and its management rights. Mere acquisition of SLT's management rights was not sufficient to grant Price II, or any other lender, the right to participate in the management of the bank. Rather, the real purpose behind forcing SLT to give up its management rights was probably to prevent SLT from mismanaging away the secured party's profits and surplus. More importantly, once SLT lost its rights to profits and surplus and management, SLT ceased to be a partner because the major criteria necessary for establishing partnership status must continually exist to maintain that status. When both elements cease to exist, logic dictates that partnership status is lost. Accordingly, SLT ceased to be a partner on November 26, 1985, the date Price II took constructive possession of the collateral.[67]

## B. *Dissolution of the Partnership*

■ Under the Texas U.P.A., a dissolution "is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." [68] Clearly, there was a change in the relation of the partners once SLT ceased to be a partner. In addition to a statutory dissolution, a dissolution occurred under the partnership agreement when Price II foreclosed on its security interest.[69]

The significance of a dissolution under the partnership agreement is that Price I, as the sole remaining partner, acquired the

---

**65.** *See supra* notes 50–54 and accompanying text.

**66.** *See* art. 6132b, § 18(1)(g).

**67.** SLT argues that it continues to be a partner in the bank because there has not been a valid foreclosure sale. SLT considers the September 10, 1986 foreclosure sale to be a nullity. Supplemental Brief of the Plaintiff in Opposition to the Motion of the Price Defendants for Summary Judgment at 16 (January 9, 1989). SLT is confused.

SLT lost is partnership status long before the September 10 sale. Foreclosure is a process by which a pledgor of personal property is deprived of his interest therein. BLACK'S LAW DICTIONARY 581 (5th ed. 1979). The process includes the subsequent sale of the property in order to satisfy the underlying debt. *Id.* The only effect of a sale is to forever cutoff the debtor's rights in the collateral. *See Southwestern Peanut Growers Assoc. v. Womack*, 179 S.W.2d 371, 373 (Tex.Civ.App.—Eastland 1944, no writ).

SLT's loss of rights is two-fold. Upon default, SLT's interest in the collateral passed to Price II. The default triggered an immediate right in Price II to "sell, dispose of, hold, use or lease any or all of the Collateral as [Price II] in its sole discretion shall decide." *Thomas,* 631 F.Supp. at 124 (quoting the SLT–Newcomb Security Agreement § 4.2(iii)). The only right SLT had was to redeem its interest the profits and surplus and management by tendering the full payment due on the nonrecourse note. The right to redeem does not alter the fact that SLT lost its partnership status. The right of redemption merely gave SLT an opportunity to regain that status. Once the September 10 foreclosure sale occurred, however, SLT's right to redeem its partnership status was lost forever. *See Southwestern Peanut,* 179 S.W.2d at 373; TEX. BUS. & COM.CODE ANN. §§ 9.504(d), 9.506 (Vernon Supp.1989).

**68.** Art. 6132b, § 29.

**69.** *See* Partnership Agreement § 18(b)(v), which provides that a dissolution occurs when any partner makes an assignment for the benefit of creditors. It bears reemphasizing that the mere making of the assignment is not enough to create a dissolution. The intended effect of this subsection only occurs in a case like this when the secured party acts or seeks to protect its security interest through the foreclosure process. *See supra* notes 61–62 and accompanying text.

status of a liquidating partner.[70] Such status allowed Price I to continue the private banking operations of the partnership without a liquidation.[71] Consistent with that authority, Price I authorized Price II to exercise the management rights it had acquired from SLT's default. Once this right was conferred, Price II acquired partnership status,[72] and the two trusts were free to operate the bank as they saw fit.

The Court recognizes the semantical incongruity of a sole partner having the right to carry on a business that requires the presence of two persons in order to establish its formal existence. Such a right, however, is conferred by section 18(d)(ii) of the partnership agreement, and the agreement of the parties is controlling.[73] Moreover, even if the partnership agreement were silent on this matter, the Texas U.P.A. would reach the same result. In discussing section 29 of the Texas U.P.A., the Texas Supreme Court stated that a partnership is only dissolved as to the withdrawn partner.[74] The remaining partners may continue on with the business of the partnership.[75]

In this case, the dissolution terminated the partnership only in the technical sense that Price I's right to continue the business constituted a new partnership.[76] There-fore, it seems fair to say that under Texas partnership law, the winding up process mentioned in sections 29 [77] and 30 [78] does not require a liquidation of the partnership as a matter course. Rather, the winding up language of those sections, when applied to a continuing business, simply means that there is a winding up only to the limited extent of paying off the former partner who caused the dissolution.

■ Price I, thereby, had the right to continue the partnership without a liquidation, whether that right existed under the partnership agreement or Texas U.P.A. Either way, the result is the same. The more important question is whether the partnership owes any financial compensation to SLT for its specific interest in partnership property, as of the date that SLT ceased to be a partner.[79] Price I argues that when SLT defaulted and Price II subsequently seized the collateral, the seizure covered SLT's entire interest in the partnership. The Court agrees, but not for the conclusory reasons asserted by the Price defendants.

As previously stated, the security agreement encompassed SLT's profits and surplus in the bank, as that interest is defined by section 26 of the Texas U.P.A. The term "profits" refers to a partner's interest

---

**70.** Partnership Agreement § 18(b)(v).

**71.** Partnership Agreement § 18(d)(ii). The Texas U.P.A. would permit a similar result. *See* art. 6132b, § 41(6); *infra* notes 74–75 and accompanying text.

**72.** This conclusion is strengthened by the Court's original analysis of what constitutes a partnership. Price II is a partner only because it is now sharing in the profits and surplus and management of the bank. *See supra* notes 50–54 and accompanying text.

SLT argues that Price II cannot be a partner because "no person can become a member of a partnership without the consent of all the partners," art. 6132b, § 18(1)(g), and SLT has not given its consent that Price II become a partner. As previously indicated, the argument is without merit because at the time Price II was admitted into the partnership, SLT was not a partner, and its consent was not required.

**73.** *Park Cities,* 534 S.W.2d at 672.

**74.** *See Thomas v. American Nat'l Bank,* 704 S.W.2d 321, 323–24 (Tex.1986) (a partnership is only dissolved as to the withdrawn partner; the remaining partners may elect to continue operating the partnership).

**75.** *Id.* This Court attaches no significance to the plural use of the word "partners" because Texas law holds that a partnership is "an entity legally distinct from its partners." *Haney v. Fenley, Bate, Deaton & Porter,* 618 S.W.2d 541, 542 (Tex.1981) (per curiam); *see also,* art. 6132b, § 2 (partnership is a person).

**76.** Art. 6132b, § 41, Source and comments at ¶ 2.

**77.** See *supra* note 68 and accompanying text.

**78.** Art. 6132b, § 30 provides that "[o]n dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed."

**79.** SLT does not appear the make this argument, not even in the alternative, because it steadfastly contends that it continues to be a partner in the bank.

in monetary distributions of the partnership. Generally, this would be the gross proceeds of a business transaction less the costs of that transaction, i.e., net proceeds.[80] On the other hand, the term "surplus" is somewhat more difficult to define, but its character is certainly financial in nature.[81] The term encompasses monetary distributions that are not net proceeds, as well as nonmonetary, nonliquidated assets of the partnership. It constitutes the net amount left over if partnership assets were used to discharge partnership liabilities.[82] Ergo, since section 40(a)(I) includes partnership property as an asset, and surplus equals the net assets remaining after discharge of partnership debts, Price II's acquisition of SLT's interest in the surplus included SLT's financial interest in partnership property.

SLT's loss of its financial interest in partnership property is significant because it affects SLT's final property right of a specific interest in partnership property. Texas U.P.A. section 25 deals with the nature of a partner's interest in specific partnership property. A careful reading of section 25 clearly indicates that a partner's interest in specific partnership property is possessory in nature rather than financial.[83] The impact to SLT is that it is not entitled to any compensation for its interest in specific partnership property. As a possessory interest, SLT's interest in specific partnership property is subordinated to or derivative of SLT's financial interest in that property.

Put another way, a partner's financial interest in partnership property versus its possessory interest in that property is comparable to stock ownership in a corporation. The financial interest in the partnership, which is a partner's interest in profits and surplus, is like stock and deals with an ownership interest in the entire organization. The possessory interest in specific partnership property is similar to a shareholder's interest in property owned by a corporation. To sell or lose one's interest in the former constitutes an automatic relinquishment of any interest or rights in the latter. Since shareholders are not entitled to compensation for the loss of their possessory interests in corporate property, there is no reason why SLT should be compensated for the possessory loss of its interest in the specific partnership property of the bank.[84]

## C. *SLT's Liability to Third Parties*

Having determined that SLT is no longer a partner in the bank and not entitled to any compensation for the loss of its partnership interest, the only remaining issue is SLT's liability to third parties. Section 36(1) provides that "[t]he dissolution of the partnership does not of itself discharge the existing liability of any partner." In this regard, SLT remains liable only for those partnership obligations that existed prior to November 26, 1985. That liability, if any, continues until discharged.

As a new partner Price II is liable for the preexisting debts of the partnership, but that liability is not personal in nature and can only be satisfied from partnership property.[85] Furthermore, those

---

80. BLACK'S LAW DICTIONARY 1090 (5th ed. 1979).

81. *See Bader v. Cox,* 701 S.W.2d 677, 681 (Tex. App.—Dallas 1985, writ ref'd n.r.e.).

82. *See Bader,* 701 S.W.2d at 681–82; *Humphrey v. Bullock,* 666 S.W.2d 586, 590 (Tex.App.—Austin 1984, writ ref'd n.r.e.); *Egan v. American State Bank,* 67 S.W.2d 1081, 1084 (Tex.Civ.App. —Amarillo 1934, writ refused); art. 6132b, § 40(a)-(c).

83. *See* art. 6132b, § 25.

84. The Court has previously discussed that where there is a continuation of the business, there is a winding up only in the technical sense of paying off the partner who was responsible for the dissolution. Since SLT is not entitled to any compensation, a winding up was not required.

85. *See Miller v. Doughty,* 520 S.W.2d 586, 591 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.); art. 6132b, §§ 17 and 41(7). Under section § 17, an incoming partner is liable for preexisting obligations, but that liability can only be satisfied out of partnership property. Similarly, § 41(7) provides that where a dissolved partnership is continued on, an incoming partner is liable to the creditors of the dissolved partnership, but that liability can only be satisfied out of partnership property.

persons who were creditors of the bank prior to SLT's cessation as a partner continued to be creditors of the bank after its dissolution.[86] New liabilities, if any, incurred by Price I during the period of November 26 through December 20 must be assumed by Price I because it was the only party who could have created those liabilities. From December 20 on, Price I and Price II share equally the bank's liability to third parties.[87] The end result is that any concerns SLT has about the December 31, 1985 Enterprise transaction are unfounded and without basis in law. This is true even though the Enterprise transaction, or any other post-dissolution transaction, may have been conducted under the partnership's original name of the Church & Thomas Bank.[88]

## III. WHAT CAUSES OF ACTION THE SLT TRUST CAN ASSERT

■ Against the previous discussion of facts and analysis, it is clear that the plaintiffs have little or no standing to assert many of the causes contained in their second amended complaint. For the sake of clarity, however, the Court will separately address each cause of action.

### A. *Count I—Application for Dissolution*

This count is brought pursuant to section 32 of the Texas U.P.A. and seeks a decree of dissolution. Section 32(1), however, provides that an application for dissolution can only be brought by or for a partner. In the alternative, section 32(2) permits an application to be brought by the purchaser of a partner's interest. SLT fails to meet either requirement. SLT is not a partner and has not been one since November 26, 1985. Nor is SLT a purchaser because it never availed itself of the opportunity to repurchase its partnership interest. Accordingly, SLT has no standing under section 32 to bring this claim.

### B. *Count II—Breach of the Partnership Agreement for the Enterprise Transaction, Stanhope Transaction, & Nonpayment of Third–Party Obligations*

SLT alleges that the Enterprise transaction is a breach of the partnership agreement. How the transaction was a breach is not clear. Nevertheless, SLT has no standing to assert this claim because the Enterprise transaction occurred after SLT lost its partnership status.

With regard to the Stanhope transaction, this Court concurs with the New York court that the Stanhope transaction was not relevant then,[89] and further concludes it is not relevant now. Nowhere in the partnership or security agreements is the Stanhope transaction mentioned.[90] Moreover, Thomas Construction is not a party to the partnership or security agreements. Nor can it be said that the partnership was formed for the benefit of Thomas Construction such that it would have third-party beneficiary status. Thus, this claim must be dismissed because Thomas Construction is not a party to this litigation, and neither plaintiff has standing to bring the claim on Thomas Construction's behalf.

The final claim under count II concerns the nonpayment of Thomas' management fee and certain third-party expenses. The management fee claim is duplicitous of count VIII and will be dismissed. As for the third-party expenses, the plaintiffs claim these are legal and accounting ex-

---

**86.** Art. 6132b, § 41(6) (where a partner is expelled and the remaining partners continue the business, the creditors of the dissolved partnership are creditors of the person continuing the business).

**87.** Though not germane to the resolution of this dispute, the analysis repeats itself when Price II transferred its partnership rights to Price III, unless the parties agreed otherwise. Therefore, Price II's liability for future actions of the bank ceased on September 10, 1986. Price III is liable for the preexisting debts of the partnership, but that liability is not personal and can only be satisfied out of partnership property. From September 10, 1986, forward, Price I and Price III share equally in all prospective liability of the bank.

**88.** Section 18(d)(ii) permits the liquidating partners to retain the partnership's name.

**89.** *Thomas,* 631 F.Supp. at 116 n. 2.

**90.** *Id.*

penses that have been due and owing for more than six months. The plaintiffs further claim that Price I's refusal to pay these debts constitutes a breach of the partnership agreement.

These claims lack sufficient factual specificity to state a claim upon which relief can be granted. There is no indication as to whom the expenses are due, the amounts due each individual, when the expenses were incurred and so forth. Moreover, even if the plaintiffs contentions were true, which the Court presumes, the plaintiffs are seeking to assert causes of action that belong to someone else. If these particular legal and accounting professionals have not been paid, then they can sue the partnership, subject to whatever valid defenses the partnership might assert. These claims are not a breach of the partnership agreement and must be dismissed.

## C. Count III—Breach of the SLT–Newcomb Security Agreement

As to this count, SLT seems to be contending that the execution of the Enterprise transaction and Thomas and Gram's ouster from the management committee constituted a breach of the SLT–Newcomb security agreement. Apparently the plaintiffs forgot that the security agreement was the subject of the New York litigation, and that they lost. The matter having been previously decided by a court of competent jurisdiction, this claim is barred by res judicata.[91] Moreover, since SLT was not a partner at the time of the Enterprise transaction, it has no standing to assert this claim. As for Thomas and Gram's ouster from the management committee, that is a consequence of SLT's decision to default on its loan obligation.[92] To the extent that the loss of management rights is a breach of Thomas' management agreement, the claim is duplicitous of count VIII and will be dismissed.

## D. Count IV—Civil Conspiracy to Misapply Partnership Property & Funds & Count V—RICO Violation

These two claims are simply another rehash of the Enterprise transaction. Once again, Thomas, in his individual capacity, has no standing to bring either claim because he was not a partner of the bank. SLT has no standing because it lost its partnership status prior to the occurrence of the Enterprise transaction. These claims must be dismissed.

## E. Count VI—Intentional Interference with the Bank's Operations & Count VII—Negligent Legal Representation

These counts arise out of conduct committed by the law firm of Baker & Botts and L.P. Thomas, a partner with Baker & Botts.[93] Count VI involves two claims. First, that Baker & Botts intentionally interfered in the business of the bank when Baker & Botts advised the bank's cashier not to permit Thomas to participate in the management of the bank either in his individual capacity or as trustee of SLT. The second claim concerns Baker & Botts collusive participation in the Enterprise transaction. Count VII simply claims that Baker & Botts was negligent in advising the bank to go ahead with the Enterprise transaction.

The Court previously granted summary judgment in favor of Baker & Botts as to these two counts. Unfortunately, the Court's December 18, 1987 order did not specify why. Regardless of what the Court's thinking may have been at that time, today's opinion provides ample reason for the Court to reaffirm its position. Thus, assuming arguendo that Baker & Botts was counsel for the bank, as the plaintiffs contend, neither plaintiff has standing to bring this cause of action. Baker & Botts owed no duty to Thomas in his individual capacity because he was never a partner in the bank. No duty was owed in his management capacity because

---

**91.** *Acree v. Air Line Pilots Assoc.,* 390 F.2d 199, 202–03 (5th Cir.), *cert. denied,* 393 U.S. 852, 89 S.Ct. 88, 21 L.Ed.2d 122 (1968).

**92.** *Thomas,* 631 F.Supp. at 125.

**93.** Both defendants will simply be referred to as Baker & Botts.

his management agreement had been terminated. No duty was owed to SLT because it lost its partnership status prior to the occurrence of the Enterprise transaction. Accordingly, these claims will remain dismissed.

### F. Count VIII—Breach of Thomas' Management Agreement

This claim involves Thomas' individual contract for management assistance to the bank. Originally, Thomas had a three-year agreement that would pay him $396,000 plus expenses. The term of the agreement was from November 16, 1983, through November 16, 1986. Thomas claims he is owed $291,000 in management fees and $80,392.93 in expenses. The defendants contend Thomas and Lawrence Price mutually agreed to stop receiving management fees. Since this claim has never been the subject of a motion for summary judgment, the Court does not have sufficient briefing or evidence to make an informed decision as to disposition of this claim. This claim, therefore, remains viable.

### G. Count IX—Improper Call for Further Capital Contribution

SLT claims that by letter dated April 12, 1986, Price I made an improper call for an additional capital contribution in the amount of $27,906.61. SLT seeks a declaratory judgment that the capital call was not justified. The defendants respond that the claim is moot because they no longer consider SLT to be a partner in the bank. Thus, they saw no reason to enforce the capital call. The Court agrees with the defendants. Since SLT is an ex-partner, the Court would not permit the defendants to enforce the capital call even if they had pursued the matter. This claim is dismissed as moot.

### IV. CONCLUSION

The consequences of a partner pledging as security his interest in the profits and surplus and management of a partnership are serious. Upon default, the secured party acquires an immediate right to begin receiving the debtor's interest in the profits and surplus. The secured party also obtains the debtor's management rights, but there is no right to interfere in the management of the partnership without the consent of the remaining partner. Regardless of whether the secured party obtains the right to participate in the management of the partnership, the debtor ceases to be a partner because the criteria that create a partnership must continually exist. Accordingly, there is a dissolution because there is a change in the relation of the partners.

Despite the dissolution, the Texas U.P.A. permits the remaining partner to continue the partnership. A winding up is required only to the limited extent of paying off the former partner who caused the dissolution. On these facts no winding up is required because the debtor is not entitled to any compensation. There is no right to be compensated for the specific interest in partnership property because such an interest is possessory in nature rather than financial. The financial interest in partnership property passed to the secured party as surplus.

A defaulting debtor-partner's liability to third parties is limited to those obligations that existed prior to its loss of partnership status. There is no liability for causes of action that accrued after the dissolution. The debtor has no standing to challenge post-dissolution activities of the partnership. Moreover, once the secured party receives the consent of the remaining partner to exercise the management rights obtained upon the debtor's default, the secured party becomes a partner. As an incoming partner, the secured party is liable for the preexisting debts of the partnership, but that liability is not personal in nature and can only be satisfied out of partnership property. In sum, the SLT Trust has no standing to be a plaintiff in this case.

### V. ORDER

It is, therefore, ORDERED, ADJUDGED, and DECREED that the claims alleged in counts I through V and XI are DISMISSED. SLT is no longer a plaintiff

in this action and is hereby DISMISSED. The Court ADHERES to its previous dismissal of the claims alleged in counts VI and VII. The only remaining claim is that asserted by plaintiff James Thomas, in his individual capacity, under count VIII of plaintiffs' second amended complaint.